Sandra GRAVES, Appellant,

v.

Michael TOMLINSON, Bryan Rice, Hartman Leito & Bolt, LLP, and Rice Stewart Faris & Co., Appellees.

No. 14–08–00654–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 30, 2010.

Jack H. Emmott, III, Houston, Richard R. Orsinger, San Antonio, for appellant.

Diana Brooke Cockrell, Fort Worth, Ronald E. Ferris, Dickinson, for appellees.

Panel consists of Justices FROST, BOYCE, and SULLIVAN.

## OPINION

WILLIAM J. BOYCE, Justice.

Sandra Graves and Michael Tomlinson each appeal from the trial court's divorce decree on numerous grounds. Sandra Graves also appeals from the trial court's separate judgment awarding fees in favor of court-appointed auditor Bryan Rice and his firms Hartman Leito & Bolt, LLP, and Rice Stewart Faris & Co. We affirm in part and reverse and remand in part.

## Background

Graves and Tomlinson were married on September 25, 1997. Graves had three children when she married Tomlinson. Graves's older son, Ron Graves, was born disabled in 1967; her younger son, Charles Babb, was born in 1979; and her daughter, Rebecca Babb, was born disabled in 1982 and died in 1997. Tomlinson had one daughter from a previous marriage.

When Graves and Tomlinson married, Tomlinson was engaged in farming and ranching; he continued those activities during the marriage. Graves is a licensed home and community-based services program provider for the Texas Department of Aging and Disability Services.

Graves formed a sole proprietorship called Sandra Graves d/b/a All The Little Things Count in 1997. This sole proprietorship provides home and community-based services for mentally handicapped and disabled persons in group homes, foster care, and supported home living. Graves created a limited liability company called All The Little Things Count, LLC in 2000. The LLC has been a home and community-based services program provider since May 2007. Together, the sole proprietorship and the LLC employ about 100 people and serve more than 300 clients.

In December 1999, Graves created a non-profit corporation called All The Little Things Country. The corporation provides services for multiple entities including All The Little Things Count; All The

Little Things Count, LLC; Volunteers of America; the Gulf Coast Mental Retardation Authority; and the Harris County Mental Retardation Authority.

Graves filed for divorce in June 2005, and protracted divorce proceedings ensued. The parties had numerous discovery disputes throughout the proceedings; they twice mediated discovery disputes and entered into settlement agreements regarding their discovery disputes. The case was tried to a jury from January 14 through January 31, 2008.

In 17 questions, the jury was asked to determine (1) whether grounds for divorce existed between the parties; (2) the characterization of the parties' property; (3) the value of numerous properties; (4) whether Graves committed fraud with respect to the purchase of a building and payments she made to her father and her ex-husband; (5) whether Tomlinson committed constructive fraud or waste with respect to certain community property; (6) whether Graves committed constructive fraud or waste with respect to certain community property; and (7) Graves's and Tomlinson's reasonable and necessary attorney's fees, costs, and expert fees.

The trial court held several post-trial hearings. Among other things, the trial court considered the parties' respective motions to disregard certain of the jury's answers. The trial court also considered Tomlinson's pre-trial motion for sanctions, which the court had taken under advisement. Additionally, the trial court considered (1) the parties' objections regarding the division of property; and (2) a petition in intervention for expert witness fees filed by court-appointed auditor Bryan Rice, and by Rice's former and current firms.

The trial court signed a Final Decree of Divorce on April 16, 2008. The trial court also signed a judgment for expert witness fees on April 16, 2008; this judgment

made Graves and Tomlinson jointly and severally liable for fees incurred by auditor Rice and his firms. Graves filed a request for findings of fact and conclusions of law in connection with the divorce decree and the judgment for expert witness fees on May 5, 2008.

On May 16, 2008, Graves filed a motion for new trial with respect to (1) the final divorce decree; and (2) the judgment for expert witness fees. Graves simultaneously filed a motion to modify, correct, or reform the final divorce decree and the judgment for expert witness fees, along with numerous objections. Graves filed a notice of past due findings of fact and conclusions of law on June 2, 2008.

The trial court filed findings of fact and conclusions of law on February 4, 2009. Among other things, the trial court's findings of fact identified numerous instances of litigation misconduct by Graves warranting sanctions of $250,000 in attorney's fees. Graves and Tomlinson timely filed their respective notices of appeal.

### Analysis

#### I. Graves's Appeal

We begin by addressing Graves's appeal before addressing Tomlinson's cross-appeal.

#### A. Judicial Estoppel

■ As a threshold matter, Tomlinson argues that Graves is judicially estopped to pursue this appeal "due to her unequivocal position and oral testimony in the Trial Court that she would accept whatever findings the jury makes and whatever orders the Court makes." Tomlinson refers to an exchange during trial in which Graves's counsel asked her: "Will you accept whatever findings the jury makes and whatever orders the Court makes?" Graves answered, "Yes, I will." We reject

Tomlinson's invocation of judicial estoppel on this record.

The doctrine of judicial estoppel bars a party who has successfully maintained a position in a prior judicial proceeding from later adopting an inconsistent position unless the party can show that the prior statement was made inadvertently due to mistake, fraud, or duress. *Vinson & Elkins v. Moran*, 946 S.W.2d 381, 396 (Tex.App.-Houston [14th Dist.] 1997, writ dism'd). Judicial estoppel upholds the sanctity of the oath and targets the prejudice that would result to the administration of justice if a litigant were allowed to swear one way one time and a different way another time. *Id.*

Judicial estoppel applies when (1) a sworn, prior inconsistent statement was made in a judicial proceeding; (2) the party now sought to be estopped successfully maintained the prior position; (3) the prior inconsistent statement was not made inadvertently or because of mistake, fraud, or duress; and (4) the statement was deliberate, clear, and unequivocal. *Id.*

Judicial estoppel does not apply to a contradictory position taken in the same proceeding; it comes into play only in a subsequent action. *Id.* at 397 (citing *Wells v. Kansas Univ. Endowment Ass'n*, 825 S.W.2d 483, 488 (Tex.App.-Houston [1st Dist.] 1992, writ denied)). An appeal in the same case is not a "subsequent action" to which judicial estoppel applies. *See id.* Because Graves's appeal is not a subsequent action, judicial estoppel is inapplicable here. In any event, the quoted exchange does not provide a reasonable basis for concluding that Graves intended to waive her appellate rights. Accordingly, we overrule Tomlinson's issue predicated on judicial estoppel.

## B. Sufficiency of the Evidence

In her first issue, Graves raises three sub-issues challenging the sufficiency of the evidence supporting (1) certain jury findings adverse to her; and (2) the trial court's decision to disregard a jury finding in her favor.

### 1. Farm and ranch equipment

In her first sub-issue, Graves argues that there is legally and factually insufficient evidence to support the jury's finding that 40 percent of the farm and ranch equipment was Tomlinson's separate property.

Graves argues that Tomlinson's sworn Amended Inventory and Appraisement dated January 11, 2008, in which he listed the farm and ranch equipment as community property, constitutes a judicial admission that the equipment is indeed community property. Graves also argues that Tomlinson's "conclusory testimony, uncorroborated by documentation and contrary to his sworn inventory, is insufficient" under a clear and convincing burden of proof to support the finding that 40 percent of the equipment was Tomlinson's separate property.

The Texas Family Code defines separate property as that property owned or claimed by a spouse before marriage, acquired during the marriage by gift, devise, or descent, or as a recovery for personal injuries sustained during the marriage. Tex. Fam.Code Ann. § 3.001 (Vernon 2006); *Barnett v. Barnett*, 67 S.W.3d 107, 111 (Tex.2001). Community property consists of the property, other than separate property, acquired by either spouse during marriage. Tex. Fam.Code Ann. § 3.002 (Vernon 2006); *Barnett*, 67 S.W.3d at 111. All property possessed by either spouse during or upon dissolution of the marriage is presumed to be community property.

Tex. Fam.Code Ann. § 3.003(a) (Vernon 2006); *Barnett,* 67 S.W.3d at 111.

■ To overcome the community property presumption, a spouse claiming assets as separate property must establish their separate character by clear and convincing evidence. Tex. Fam.Code Ann. § 3.003(b); *Stavinoha v. Stavinoha,* 126 S.W.3d 604, 607 (Tex.App.-Houston [14th Dist.] 2004, no pet.). "Clear and convincing" evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *In re J.F.C.,* 96 S.W.3d 256, 264 (Tex. 2002); *Stavinoha,* 126 S.W.3d at 607; *see also* Tex. Fam.Code Ann. § 3.003(b).

■ "The spouse claiming that certain property is 'separate' must trace and clearly identify the property claimed to be separate." *Zagorski v. Zagorski,* 116 S.W.3d 309, 316 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property. *Id.* As a general rule, the clear and convincing standard is not satisfied by testimony that property possessed at the time the marriage is dissolved is separate property when that testimony is contradicted or unsupported by documentary evidence tracing the asserted separate nature of the property. *Zamarripa v. Zamarripa,* No. 14-08-00083-CV, 2009 WL 1875580, at *3 (Tex.App.-Houston [14th Dist.] June 30, 2009, pet. denied) (mem.op.). Any doubt as to the character of property should be resolved in favor of the community estate. *Boyd v. Boyd,* 131 S.W.3d 605, 612 (Tex. App.-Fort Worth 2004, no pet.).

■ In a legal sufficiency review of a separate property finding, we examine all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Stavinoha,* 126 S.W.3d at 608; *see also In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2003). Looking at the evidence in the light most favorable to the finding means we must (1) assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so; and (2) disregard all contrary evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Stavinoha,* 126 S.W.3d at 608; *see also In re J.F.C.,* 96 S.W.3d at 266. However, we can consider undisputed facts that do not support the finding. *Stavinoha,* 126 S.W.3d at 608; *see also In re J.F.C.,* 96 S.W.3d at 266. If we determine that no reasonable fact finder could form a firm belief or conviction of the truth of the matter to be proved, we must conclude that the evidence is legally insufficient *Stavinoha,* 126 S.W.3d at 608; *see also In re J.F.C.,* 96 S.W.3d at 266. If we determine that the evidence is factually insufficient, we must detail in our opinion why we have concluded that a reasonable fact finder could not have credited disputed evidence in favor of the finding. *Stavinoha,* 126 S.W.3d at 609; *see also In re J.F.C.,* 96 S.W.3d at 266–67.

During Graves's trial testimony, the trial court admitted her inventory into evidence; her inventory listed the farm and ranch equipment as community property.

On direct-examination, Tomlinson's counsel questioned Tomlinson regarding items of farm and ranch equipment that he considered to be his separate property. Tomlinson testified that

- he purchased three tractors "used in mid—about '85 to '87;"

- "The next one is a Model 986 tractor. That's about a 1979 model. And that

was bought and paid for, probably, in '81 or '82;"

- "The next one is a Model 7140 MFD. That was bought before the marriage. I possibly might have owed a little bit on that one after I was married to Sandra, but the bulk of it was paid.... I bought that in about '91, '92;"
- "The next two combines were bought and paid for before the marriage. They're very old;"
- "The next one is a 30–foot Great Plains drill that I bought from Alvin Equipment in Alvin. I probably bought that in 1988. It was bought and paid for before the marriage;"
- "The next one is some real old Drag Harrows. They're pretty poor. They're rusted. And those were bought, probably, in around '92. And I bought and paid for those from EI Campo, Texas;"
- "The next three are shop made rollers that we don't hardly use much anymore, but I bought those at an auction in about 1988;" and
- "The Taylor Way 3–point 8–foot blade is very, very old. I probably bought that in the late Eighties."

The trial court admitted Tomlinson's inventory into evidence; his inventory listed all of the farm and ranch equipment as community property. In discussing his inventory, Tomlinson stated the equipment's value should be $170,000 instead of the listed $280,850; he did not comment on the inventory's characterization of all farm and ranch equipment as community property.

As noted above, the clear and convincing standard is not satisfied by testimony that items possessed at the time the marriage

is dissolved are separate property when that testimony is contradicted or unsupported by documentary evidence tracing the asserted separate nature of the items. *Zamarripa*, 2009 WL 1875580, at *3; *In re Marriage of Santopadre*, No. 05–07–00027–CV, 2008 WL 3844517, at *3 (Tex. App.-Dallas Aug. 19, 2008, no pet.) (mem. op.). Here Tomlinson's testimony is contradicted by his own sworn inventory and by Graves's inventory. Tomlinson offered no documents to support his characterization of these assets in his testimony. Therefore, no reasonable fact finder could find that Tomlinson's unsupported testimony constitutes clear and convincing evidence necessary to overcome the community property presumption and establish that 40 percent of the farm and ranch equipment was Tomlinson's separate property. We sustain Graves's first sub-issue.[1]

## 2. Value of All The Little Things Count and All The Little Things Count, LLC

In her second sub-issue, Graves argues that that the evidence is legally and factually insufficient to support the jury's assessment of the value of All The Little Things Count and All The Little Things Count, LLC. Unlike the separate property determination discussed above, to which the clear and convincing burden of proof applied, the factual determination regarding valuation was submitted in the jury charge under a preponderance of the evidence standard.

### a. Legal sufficiency standard

In reviewing the legal sufficiency of the evidence to support a finding governed by a preponderance of the evidence standard, the court must consider

---

1. We need not address Graves's argument that Tomlinson's Amended Inventory and Appraisement constitutes a judicial admission that the listed farm and ranch equipment is community property.

evidence in the light most favorable to the verdict; it must credit favorable evidence if reasonable jurors could do so and disregard contrary evidence unless reasonable jurors could not do so. *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 770 (Tex.2010) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex.2005)). " 'The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.' " *Id.* (quoting *City of Keller*, 168 S.W.3d at 827).

■ A legal sufficiency challenge will be sustained only if (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex.2003). More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex.2004). Evidence does not exceed a scintilla if it is so weak as to do no more than to create a mere surmise or suspicion that the fact exists. *Id.*

■ Following a jury trial, a legal sufficiency challenge must be preserved in the trial court through one of the following procedural steps: (1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the question to the jury; (4) a motion to disregard the jury's answer to a vital fact question; or (5) a

motion for new trial. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex.1992); *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex.1991).[2.]

■ Because Sandra's sufficiency challenge focuses in significant part on expert testimony, we also must consider the difference between (1) a challenge to an expert's methodology; and (2) a legal sufficiency challenge predicated on a contention that an expert's testimony lacks probative value. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex.2004); *Nip v. Checkpoint Sys., Inc.*, 154 S.W.3d 767, 770–71 (Tex.App.-Houston [14th Dist.] 2004, no pet.). These are two distinct inquiries.

■ "When the expert's underlying methodology is challenged, the court 'necessarily looks beyond what the expert said' to evaluate the reliability of the expert's opinion." *Coastal Transp. Co.*, 136 S.W.3d at 233. "When the testimony is challenged as conclusory or speculative and therefore non-probative on its face, however, there is no need to go beyond the face of the record to test its reliability." *Id.* Therefore, "when a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis." *Id.;* *Nip*, 154 S.W.3d at 770–71. However, when the challenge is restricted to the face of the record—when expert testimony is speculative or conclusory on its face—then a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility. *Coastal*

**2.** A party who preserves a legal sufficiency challenge by a motion for new trial is entitled at most to a remand rather than rendition of judgment on appeal. *Brown v. Traylor*, 210 S.W.3d 648, 659 (Tex.App.-Houston [1st Dist.] 2006, no pet.); *see also Horrocks v. Tex. Dep't of Transp.*, 852 S.W.2d 498, 499 (Tex.1993).

*Transp. Co.,* 136 S.W.3d at 233; *Nip,* 154 S.W.3d at 770–71.

### b. Factual sufficiency standard

In reviewing a factual sufficiency point, the court must weigh all of the evidence in the record; findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996) (per curiam). The court must clearly state why the jury's finding is supported by factually insufficient evidence or is so against the great weight and preponderance as to be manifestly unjust. *Id.*

A complaint that the evidence is factually insufficient to support a jury finding must be raised in a motion for new trial as a prerequisite to raising such a complaint on appeal. Tex.R. Civ. P. 324(b)(2); *Cecil,* 804 S.W.2d at 510.

### c. Application of standards

The jury assessed the value of All The Little Things Count at $19,000 and the value of All The Little Things Count, LLC at $1,250,000. Graves contends that the jury should have assessed the value of All The Little Things Count at a negative $87,000 and the value of All The Little Things Count, LLC at $200,000.[3]

Graves contends that the "evidence bearing upon the Jury's valuation of the LLC includes: (i) Sandra's testimony . . .; (ii) Px59, a summary of payments from the State of Texas to All The Little Things Count; (iii) Michael Tomlinson's testimo-

ny; (iv) the testimony and report of Sandra's business valuation expert Bill Stewart; (v) the testimony of Michael's forensic accountant Gregory Schuelke; and (vi) the testimony and report of Michael's business valuation expert David Palmer."

According to Graves, her trial testimony establishes the following facts:

In 2000, Sandra created a limited liability company named "All The Little Things Count, LLC," in order to limit her personal liability. The LLC has been an HCS provider since May, 2007. Sandra's business has grown, and requires her to work long hours. The businesses employ about 100 persons and serve 300 to 350 clients.

In December 1999, Sandra created a non-profit corporation named All The Little Things Country. All The Little Things Country provides services for Volunteers of America, Gulf Coast MHMR, and Harris County MHMR. The company's tax returns for 2003, 2004, 2005 and 2006 were admitted into evidence. The 2006 tax return reflects total revenue of $17,970. All The Little Things Country is a different corporation from All The Little Things Count, LLC. Sandra does not own it. She cannot sell it. If it ever dissolves, the assets must be distributed to a charitable Section 501(c)(3) entity. It conducts board meetings. Federal tax law and state law prohibit individuals from improperly benefitting from a non-profit corporation. "Country" never paid San-

---

**3.** In the trial court, Graves challenged the legal sufficiency of the evidence supporting the jury's valuation of All The Little Things Count, LLC; she did not challenge the legal sufficiency of the evidence supporting the jury's valuation of the sole proprietorship All The Little Things Count. Therefore, we do not address the legal sufficiency of the evidence to support the jury's valuation of the

sole proprietorship. *See T.O. Stanley Boot Co.,* 847 S.W.2d at 220–21; *Cecil,* 804 S.W.2d at 510–11. Similarly, because Graves's motion for new trial does not challenge the factual sufficiency of the evidence supporting the jury's valuation of the sole proprietorship, we do not address this issue on appeal. *See* Tex.R. Civ. P. 324(b)(2); *Cecil,* 804 S.W.2d at 510.

dra a salary, or provided her hea[l]th insurance, or paid for upkeep on her vehicle. Its purpose is different. Sandra's forensic accountant William Stewart confirmed that she has never drawn any money out.

Even if taken as a given, these assertions do not establish that the jury's valuation of All The Little Things Count, LLC lacks sufficient evidence to support it.

Exhibit 59 consists of several e-mails from Marianne Reat, an attorney with the Department of Aging and Disability Services; these e-mails (1) attach a spreadsheet that shows the State paid All The Little Things Count, LLC $6,002,047.55 for claims it submitted from August 2006 to December 2007; (2) provide the Health and Human Services Commission website at which rate information can be accessed; and (3) inform the parties about All The Little Things Count, LLC's accounts receivable as of January 7, 2008.

Graves argues that Tomlinson's "testimony about the value of Sandra's businesses consists of two words, 'Yes, sir,' with which he merely agrees with his valuation expert David Palmer. His inventory listed a community property value of $3.5 million 'Per David Palmer, Tomlinson[']s Expert." Graves argues that Tomlinson was not "qualified to render an expert opinion on the value of [Graves's] businesses" and that his "conclusory statements amount to no evidence."

Graves contends that her business valuation expert, William Stewart, "gave the only valuation testimony the jury could rely on." Stewart valued the community property interest at negative $87,000 with respect to the sole proprietorship All The Little Things Count; $200,000 with respect to All The Little Things Count, LLC; and zero with respect to the non-profit corporation, All The Little Things Country. He valued the sole proprietorship and the LLC separately because they had different contract structures.

Stewart explained that there are three approaches available to valuing a business: the asset approach, the market approach, and the income approach. Stewart "found no comparable businesses that had sales of ownership interests, ruling out the market approach." Stewart also "rejected the income approach since it relied on projecting future cash flows of the business, and his investigation indicated that if [Graves] left the ... LLC ... her customers would leave with her, taking their cash flow with them." Stewart therefore used the asset approach to value the LLC at $400,000, but applied a discount for lack of marketability of $200,000.

Graves contends that the testimony of Tomlinson's forensic accountant, Gregory Schuelke, cannot support the jury's $1,250,000 valuation for the LLC because Schuelke did not "express an opinion as to the value of any of the three entities" and "was not hired to determine value. Instead, he was hired to 'normalize' the accounting records of [Graves's] businesses." Graves acknowledges that, in normalizing the accounting records, Schuelke (1) "adjusted assets from their depreciated book value to current value;" and (2) "added back to income any expenses charged to the business that were not really business expenses, such as allowances for family members, or nonrecurring expenses like attorneys' fees, or excess compensation paid to the owner."

Graves also argues that the valuation of Tomlinson's valuation expert, David Palmer, constitutes no evidence because his methodology is flawed. Graves claims that Palmer's valuation methodology is flawed because (1) none of the businesses he used as comparables for the market approach "provided care for severely retarded people;" and (2) he valued Graves's three busi-

nesses together instead of assigning individual values to each entity. Because Palmer's valuation was based on a flawed methodology, Graves contends that Stewart's valuation opinion was the only reliable valuation evidence the jury should have considered. Graves also contends that Palmer had inadequate time to prepare his valuation.

Schuelke testified that Tomlinson hired Palmer and him to conduct a business valuation for All The Little Things Count, All The Little Things Count, LLC, and All The Little Things Country. Schuelke focused on the normalization of the companies' business expenses and books. Schuelke explained that normalization is done because (1) certain assets or accounts have to be adjusted to their market value; and (2) expenses that are not business-related need to be excluded from the profit and loss statements. After explaining how the three entities are intertwined, Schuelke stated that he combined them for purposes of his evaluation. Schuelke also explained why he concluded in his report that several adjustments had to be made:

State of Texas (Department of Aging and Disability Services) records do not match reported revenue. Adjustments should be considered to agree [sic] revenue amounts ($159,129.03—11 months ended November 2007).

Reported Country charges accounted for as expenses in the financial documents of Count and Count, LC do not agree with revenue reported by Country. Adjustments should be considered to agree related Country Revenue and Count/ Count, LC Expenses ($242,501.74—11 months ended November 2007).

Significant professional fees have been incurred by the collective businesses related to non-operational matters and were incurred for matters that are not reasonably expected to continue. Ad-

justments should be considered to these expenses ($353,801.11—11 months ended November 2007).

Count reported an expense as Uncategorized in the amount of $100,000.00. No detail has been provided to date that establishes a business operational purpose. Thus, an adjustment should be considered.

Sandra Graves charged $108,000.00 to Count for "consulting fees" in 2007. An adjustment should be made to remove known compensation of owner for the purpose of normalizing owner's compensation.

＊　　＊　　＊

In 2007, Count and Count LC reported $748,232.29 or $378,776.83 and $369,455.46, respectively, for Country Day Hab related charges. During the same period, Country only reported Day Hab revenue from Count/ Count LC to be $505,730.55. The $242,501.74 difference should be considered a normalizing adjustment for business valuation purposes.

＊　　＊　　＊

Count and latter Count LC receive funds from the State of Texas. As stated above, roughly 98% of all revenue is received from the State. During the first eleven months of 2007, Count received $5,910,445.51 and reported $6,181,135.40 or $270,689.89 less than [sic] reported. During the same period, Count LC received $5,401,776.17 and reported $4,971,957.25 or $429,818.92 more than [sic] reported. The net $159.129.03 ($429,818.92 less $270,689.89) should be considered as a normalizing adjustment.

Schuelke stated that All The Little Things Count, LLC paid at least $40,000 in professional fees related to these divorce proceedings. Schuelke confirmed that for an 11–month period in 2007, he "added back

in [$963,432] what is, basically, income and brought back in the income that the company would have earned had the company not had some nonrecurring expenses." This data then was processed by his colleague Palmer in conducting the business valuation.

Schuelke also noted a significant shift in revenue from All The Little Things Count to All The Little Things Count, LLC. "Count was formed in 1997. In 2006, Count LC began operation. Gradually, the revenue stream in Count shifted to Count LC. Count currently has 10 times the assets of Count LC. But, as of November 2007, Count LC has 10 times the revenue. No intercompany charges relate to asset usage and no apparent distinction is made on-site whether services are being provided by Count personnel or Count LC personnel."

Graves's expert, Stewart, confirmed Schuelke's observation that the revenues for All The Little Things Count, LLC significantly increased. Stewart stated as follows in his report:

> **All the Little Things Count LC** is a Texas limited liability company that was established in May 2000 to gradually take over the business of **All the Little Things Count,** the sole proprietor. This company was formed to operate with the same clients and same employees, but with the benefits of a limited liability company under the laws governing business entities. A new provider contract was established for handicapped persons with the State of Texas. Clients have been moved gradually beginning 2006, with the intent to move most or all clients eventually.... Revenues and income for this company began to become significant in 2007.

Schedule eight attached to Stewart's report listed All The Little Things Count,

LLC's gross profit as $21,338 in December 2006 and $3,875,574 in October 2007.

Palmer testified that he had adequate time to prepare a valuation of Graves's businesses. Palmer explained that, after looking at the transactions between the three businesses, he decided "the best way to look at the value of the three entities was to push them all together and treat them as if they were just one business with three different divisions." Palmer explained that he used all three methodologies in his valuation; he gave the income approach the most weight, the market approach some weight, and the asset approach little weight.

Palmer concluded that all three entities would have a combined value of $1.5 million under the asset approach; $4.1 million under the income approach; and $6.2 million under the market approach. He explained the process he used to assess value under each approach. Palmer also listed the revenue for each entity before combining the revenues used in his calculations. Based on an 11–month period in 2007, Palmer's analysis listed the individual revenue for All The Little Things Count as $6,313,758; the individual revenue for All The Little Things Count, LLC as $5,000,477; and the individual revenue for All The Little Things Country as zero.

Palmer explained how he calculated the value under the market approach; he used data from sales of 28 comparable companies that "seemed to be in the same relative industry group, that is, health care services, providers like home health care or mental health." Palmer explained that the data from the 28 companies he used reflected what willing buyers actually paid for the comparable companies.

Ultimately, Palmer computed a weighted average of the $1.5 million, $4.1 million, and $6.2 million combined valuations of all three entities. The weighted average for

all three entities was computed as $3.5 million after deducting $1 million for Graves's goodwill.

At bottom, Graves asks this court to "evaluate the underlying methodology, technique, or foundational data used by the expert...." *Coastal Transp. Co.*, 136 S.W.3d at 233; *Nip*, 154 S.W.3d at 770–71. Graves did not object before or during trial on grounds that Palmer's valuation methodology was flawed. Because Graves did not object to Palmer's valuation methodology before or during trial, she cannot attack his methodology on appeal by way of a legal sufficiency challenge predicated on asserted flaws in his methodology. *See Coastal Transp. Co.*, 136 S.W.3d at 233; *Nip*, 154 S.W.3d at 770–71. The jury was entitled to rely on Palmer's testimony and report in assessing the value for All The Little Things Count, LLC just as it was entitled to rely on Schuelke's and Stewart's testimony and report.

In any event, Graves cannot demonstrate a lack of sufficient evidence by pointing to Palmer's global valuation figure for all three entities and insisting that an individual valuation for each entity was necessary. Palmer's report contained the calculations he used under each approach in valuing the three entities. The report listed the individual revenues of each entity, which formed the basis for Palmer's calculations and valuation under the market and income approaches. Palmer assigned 2007 revenue among the three entities as follows: $6,313,758 to All the Little Things Count; $5,000,477 to All the Little Things Count, LLC; and $0 to All the Little Things Country.

The data in Palmer's report permitted calculation of an individual valuation for All the Little Things Count, LLC based on the market approach using the LLC's individually assessed income of $5,000,477. Applying Palmer's market approach multiples to this income figure yields an individual valuation for the LLC that exceeds the $1,250,000 value assessed by the jury.[4] Therefore, the jury's valuation of the LLC permissibly fell within a range established by Palmer's data on the high end and Stewart's computation on the low end. *See Moore v. Bank Midwest, N.A.*, 39 S.W.3d 395, 401 (Tex.App.-Houston [1st Dist.] 2001, pet. denied); *Pelzig v. Berkebile*, 931 S.W.2d 398, 404 (Tex.App.-Corpus Christi 1996, no writ); *cf. Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.*, 928 S.W.2d 100, 108 (Tex.App.-Houston [14th Dist.] 1996, writ denied); *City of Houston v. Harris Cnty. Outdoor Advertising, Ass'n*, 879 S.W.2d 322, 334 (Tex. App.-Houston [14th Dist.] 1994, writ denied).

Considering the evidence in the light most favorable to the verdict, we conclude that there is more than a scintilla of evidence to support the jury's finding regarding the value of All The Little Things Count, LLC. Weighing the evidence in the record before us, we cannot conclude that the jury's valuation finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. The evidence is legally and factually sufficient; we therefore overrule Graves's second sub-issue.

### 3. Tomlinson's debt to his parents

In her third sub-issue, Graves argues that the trial court erred by disregarding

---

4. Palmer used a 97 percent multiple under the guideline public company method and a 63 percent multiple under the comparable transaction method. Applying Palmer's 97 percent multiple to the LLC's income of $5,000,477 results in a value of approximately $4,850,000 under the market approach. Applying Palmer's 63 percent multiple to the LLC's income results in a value of approximately $3,150,000 under the market approach.

the jury's finding in Question 11 that Tomlinson committed "constructive fraud/waste with respect to his and [Graves's] community property rights by incurring indebtedness and encumbering community property in favor of his parents" in the amount of $239,000. Graves argues that the trial court erred by (1) disregarding the jury's answer to Question 11; and (2) treating Tomlinson's debt as a bona fide debt.

■ A trial court may disregard a jury finding only if it is unsupported by evidence or if the issue is immaterial. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex.1994). A question is immaterial when it should not have been submitted or calls for a finding beyond the province of the jury, such as a question of law. *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex.1999).

■ Graves contends that the "Supreme Court has held that a jury finding of fraud on the community is binding on the trial court," citing *Cockerham v. Cockerham*, 527 S.W.2d 162, 173 (Tex.1975). However, the supreme court did not make a blanket pronouncement in *Cockerham* that a fraud on the community finding always is binding on a trial court. Rather, the supreme court held that the trial court should not have disregarded the jury's answer in *Cockerham* because the testimony "was sharply conflicting on this issue [whether the wife had fraudulently taken community property to make gifts] and there was certainly at least some evidence to support the jury's answer." *See id.* Therefore, a jury's answer may not be disregarded when there is "at least some evidence to support the jury's answer." *See id.*

■ The jury charge provided the following instructions in connection with Question 11:

A spouse may make moderate gifts, transfers, or expenditures of community property for just causes to a third party. However, a gift, transfer, or expenditure of community property that is capricious, excessive, or arbitrary is unfair to the other spouse. Factors to be considered in determining the fairness of a gift, transfer, or expenditure are—

1. the relationship between the spouse making the gift, transfer, or expenditure and the recipient;

2. whether there were any special circumstances tending to justify the gift, transfer, or expenditure;

3. whether the community funds used for the gift, transfer, or expenditure were reasonable in proportion to the community estate remaining.

Constructive fraud does not require an intent to deceive. It is the consequence of the breach of the relationship of trust and confidence between spouses involving a transfer, gift or waste or dissipation of community property that is capricious, excessive or arbitrary resulting in unfairness to the other spouse.[5]

Graves argues in her brief that the Agreed Temporary Orders in this case prohibited the parties from encumbering their property except for reasonable and necessary living expenses for food, clothing, shelter, transportation, medical care, reasonable attorney's fees and expenses, and acts reasonable and necessary to conduct usual business or occupation. Graves argues that the "evidence showed that in

---

5. The jury charge did not provide a separate instruction on or definition of waste. Case law states that "[w]aste occurs when one spouse, dishonestly or purposefully with the intent to deceive, deprives the community estate of assets to the detriment of the other spouse." *Giesler v. Giesler*, No. 03-08-00734-CV, 2010 WL 2330362, at *3–*4 (Tex. App.-Austin June 10, 2010, no pet.) (mem. op.).

June of 2006, during the divorce, [Tomlinson's] divorce attorney, Mr. Rader, prepared a deed of trust and security agreement in favor of [Tomlinson's] parents for a supposed $147,000 promissory note." In exchange for this promissory note, Tomlinson gave his parents a security interest in everything he owned. Graves asserts that Tomlinson neither provided a note to the independent auditor nor offered a promissory note at trial. Graves claims that Tomlinson offered only a copy of a July 17, 2006 check for $50,000 from his father to him, and a copy of a December 26, 2007 check for $25,000 check from his mother to him.

Neither these arguments nor the evidence cited in Graves's brief constitute a scintilla of evidence to support the jury's finding of constructive fraud or waste in the amount of $239,000.

First, Graves states that the trial court's agreed temporary orders prohibited encumbering the parties' property except for "reasonable and necessary living expenses for food, clothing, shelter, transportation, and medical care, reasonable attorney's fees and expenses, and acts reasonable and necessary to conduct usual business or occupation." But she does not claim or cite to any evidence showing that Tomlinson encumbered the parties' property in violation of these temporary orders. Evidence that the temporary orders prohibited the parties from encumbering their property except as specifically enumerated in the orders does not establish that Tomlinson violated the orders.

■ Constructive fraud or waste is not established by evidence that (1) Tomlinson's attorney prepared a deed of trust and security agreement in favor of Tomlinson's parents for $147,000; (2) Tomlinson offered the security agreement and deed of trust but not a promissory note into evidence; and (3) Tomlinson offered a copy of a $25,000 check from his mother and a $50,000 check from his father into evidence. At most, these facts establish that Tomlinson's parents loaned Tomlinson $147,000 and wrote him checks for $75,000. These facts do not establish constructive fraud or waste because they do not show that Tomlinson's debt to his parents was "capricious, excessive or arbitrary resulting in unfairness to the other spouse" as required by the jury instructions.

■ Second, Graves argues that the loan amounts Tomlinson testified about at trial "do not add up." Graves argues that Tomlinson first agreed with his attorney that his parents loaned him $169,000 and that his mother sent him another $40,000 to pay his attorney; Tomlinson later agreed with his attorney that his parents loaned him $147,000 and $52,000. Tomlinson's inability to recall the specific amounts he borrowed from his parents does not translate into some evidence of constructive fraud or waste.

■ Third, Graves argues that the jury found that Tomlinson committed constructive fraud or waste in connection with his cattle, horses, farming equipment, and farming operations. The jury heard testimony that (1) Tomlinson did not account for his farm and ranching income; (2) his tax returns showed more income than his accounting ledgers; and (3) there was no promissory note. Graves concludes that there "was more than a scintilla of evidence to support the jury's finding, and the trial court reversibly erred in disregarding it." However, a finding of constructive fraud or waste in connection with cattle, horses, equipment or farming operations does not establish a scintilla of evidence that Tomlinson also committed constructive fraud or waste when he borrowed money from his parents and encumbered the parties' property.

Graves's argument and cited evidence do not establish more than a scintilla of evidence that Tomlinson committed constructive fraud or waste because they do not show that the debt Tomlinson incurred was "capricious, excessive or arbitrary resulting in unfairness to" Graves. We conclude that the trial court did not err in disregarding the jury's finding in Question 11. We overrule Graves's third sub-issue.

## C. Debts Not Included in Property Division

■■■ In her second issue, Graves contends that the trial court "erred in ignoring $305,369 in debts" and "$225,841 in attorneys' fees" owed by Graves in making the property division because a trial court must consider all legitimate debts of the parties in making the property division. Graves argues that the trial court disregarded her debts and attorney's fees in its decree by removing the following items from the recognized list of debts (1) Wells Fargo # 8126; (2) Office Max # 7145; (3) Continental Airlines # 0245; (4) Sam's Club # 6065; (5) Sam's Club # 3056; (6) Wells Fargo line of credit # 7043–34; (7) a $25,000 debt owed to attorney Arch McCall; and (8) $200,841 in unpaid attorney's fees owed to Looper, Reed & McGraw and Mills Shirley, LLP.

The trial court did not disregard Graves's debts and attorney's fees in the divorce decree. The trial court considered Graves's debts and specifically listed the following debts in its decree under the heading "Division of Marital Estate:"

a. American Express ending in 6009 in the name of SANDRA C. GRAVES;

b. Wells Fargo ending in 5883 in the name of SANDRA GRAVES d/b/a All Little Things Count;

c. Wells Fargo ending in 8126 in the name of SANDRA GRAVES d/b/a All the Little Things Count;

d. Bank of America ending in 4020 in the name of SANDRA C. GRAVES;

e. OfficeMax Account ending in 7145 in the name of SANDRA GRAVES d/b/a All the Little Things Count;

f. Continental Airlines credit card ending in 0245 in the name of SANDRA GRAVES d/b/a All the Little Things Count;

g. Discover account ending in 0914 in the name of SANDRA C. GRAVES;

h. Sam's Club account ending in 3056 in the name of SANDRA GRAVES d/b/a All the Little Things Count;

i. Wells Fargo Business Loan ending in 7043–34 in the name of SANDRA CAROL GRAVES;

j. Sums owing on promissory note payable to Arch McColl;

k. Sums owing to Charles Holbrook.

The trial court did not specifically list Sam's Club account # 6065—a debt totaling $450.73 as of December 18, 2007. The trial court nonetheless included this debt by stating in the paragraph immediately following the enumerated debts that Graves should also pay "Any and all debts, charges, liabilities, and obligations incurred solely by SANDRA C. GRAVES from and after September 25, 1997, unless express provision is made in this decree to the contrary."

The trial court also considered Graves's outstanding attorney's fees. In its decree, the trial court ordered that "[e]ach party shall be responsible for his or her own attorney's fees, expenses, and costs incurred as a result of legal representation in this case, except as specifically provided herein." Therefore, Graves's assertion that the trial court disregarded her unpaid debts and attorney's fees is not supported by the record before us. Accordingly, we overrule Graves's second issue.

## D. Sanctions

In her third issue, Graves contends that the trial court erroneously assessed attorney's fees of $250,000 against her as sanctions because (1) the award exceeded attorney's fees actually incurred by Tomlinson; (2) portions of the claimed fees had been settled and paid before trial; (3) $166,150.75 of Tomlinson's fees already had been paid; (4) the sanction was waived because it was not granted prior to trial; (5) "the sanction was not just and bore no rational or reasonable relationship to Sandra's conduct, and the sanction was not the minimum necessary to secure compliance with the discovery requests;" and (6) the evidence did not support the sanctions.

We review a trial court's sanctions award for abuse of discretion. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex.1985); *see Low v. Henry*, 221 S.W.3d 609, 614 (Tex.2007).

The sanction imposed in this case is significant by any measure, and the trial court's views regarding the propriety of Graves's litigation conduct are evident. Although the choice of sanctions lies within the trial court's sound discretion, the sanctions imposed nonetheless must be just. *TransAmerican Nat'l Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex.1991). Whether sanctions are just is measured by two standards. *Id.* First, a direct relationship must exist between the offensive conduct and the sanctions imposed; the sanctions must relate directly to the abuse that prompted them. *Id.* Second, sanctions may not be excessive. *Id.*

An additional safeguard comes into play when sanctions are predicated on conduct during pre-trial discovery. The failure to obtain a pre-trial ruling on discovery disputes that exist before commencement of trial constitutes a waiver of a claim for sanctions based on that conduct. *Remington Arms Co. v. Caldwell*, 850 S.W.2d 167, 170 (Tex.1993). This safeguard forecloses a belated invocation of unadjudicated pre-trial discovery disputes as a basis for undoing or modifying the results at trial. *See id.* It does not foreclose sanctions for discovery abuse revealed for the first time during or after trial, which by definition could not have been addressed earlier. *See id.*

In conclusion of law number two, the trial court provided the following explanation for assessing $250,000 in Tomlinson's attorney's fees as a sanction against Graves:

> The actions of Sandra Graves in committing discovery abuse during these proceedings, fraudulent transfers made during these proceedings and her false and misleading testimony given in these proceedings compels this court to impose sanctions upon her, which sanctions are assessed by the imposition of reasonable and necessary attorney fees and expenses incurred by Michael Tomlinson during these trial proceedings in the amount of $250,000.00 and appellate fees as found by the jury.

The trial court thus imposed a global sanctions award of $250,000 in attorney's fees for all of Graves's collective misconduct during the divorce proceedings.

It appears from the record that at least some of the parties' discovery disputes resulted in pre-trial rulings. In finding of fact number one, the trial court referred to "numerous discovery violations and discovery abuses" but did not enumerate or specifically describe them. Therefore, we cannot determine whether Tomlinson obtained pre-trial rulings on all of the unspecified discovery disputes encompassed by finding of fact number one. *See id.* We cannot determine whether the discovery abuse referenced in finding of fact number one encompasses misconduct that

was revealed for the first time during or after trial so as to allow the imposition of sanctions even without a pre-trial ruling. *See id.*

Because we cannot tell which portion of the $250,000 sanction is attributable solely to discovery abuse, we also cannot determine whether the $250,000 sanction is (1) directly related to discovery violations referred to in finding of fact number 1; and (2) not excessive. *See TransAmerican*, 811 S.W.2d at 917; *see also Campbell v. Campbell*, 03–07–00672–CV, 2010 WL 2477782, at *6 (Tex.App.-Austin June 18, 2010, no pet.) (mem.op.) ("the record contains no justification for the amounts of sanctions imposed. Even if we assume that [party] actually committed the sanctionable acts alleged, the record contains no explanation or analysis of how the sanctions imposed were proportionate to the . . . acts.")

In findings of fact numbers two through 11, the trial court identified additional misconduct by Graves. Some of this misconduct is discovery-related, and some is not:

2. SANDRA GRAVES contemptuously disobeyed this court's orders and injunctions during the pendency of these proceedings by transferring monies and assets from the community properties to All the Little Things Country, a Texas Non–Profit Corporation controlled and directed by her.

3. SANDRA GRAVES repeatedly, intentionally and knowingly made misleading statements under oath in the proceedings before this court and repeatedly lied under oath to the court.

4. SANDRA GRAVES transferred community assets having a value in excess of $1,000,000.00 to her father during the pendency of these proceedings, in direct violation of this court's orders and injunctions, and the parties agreed temporary orders.

5. SANDRA GRAVES intentionally, knowingly and repeatedly misled the court as to the content of computer files containing accounting information maintained by her in a QuickBooks format, in which she asked the court for protection from prior discovery orders, wherein she had previously agreed to provide Michael Tomlinson and his counsel, access to this information. She falsely informed the court, through her attorneys, and under oath in testimony before the court, that those records contained information protected by federal law (HIPAA). The court relied on these false statements and assertions and restricted Michael Tomlinson's access to such information, placing a greater burden on him, and resulting in his being unable to complete a full investigation of community assets because of his lack of resources and because of the timing of his eventual access to such information, which the court, regretfully, had limited in reliance on such testimony and representations by counsel for SANDRA GRAVES during these proceedings.

6. As a direct result of SANDRA GRAVES misleading this court and concealing information requested by Michael Tomlinson, Michael Tomlinson was unable to secure a complete discovery of facts in these proceedings.

7. SANDRA GRAVES defrauded Michael Tomlinson by co-mingling community assets with a non-profit corporation known as "All the Little Things Country", a Texas non-profit corporation, which was solely controlled by Sandra Graves and was used by her to defraud the community.

8. In December 2005, SANDRA GRAVES transferred approximately $200,000.00 in cashier's checks to her son, Charles Babb during the pendency of these proceedings, which he then used

for the purchase of the real property known as 1117 Lawrence, Rosenberg, Fort Bend County, Texas. This transaction was not disclosed to Michael Tomlinson, despite discovery requests for such information. The court has subsequently severed Michael Tomlinson's claim to that real property, which was an office building used by Sandra Graves's companies, All the Little Things Count, LLC and All the Little Things Country, a Texas non-profit corporation.

9. The liabilities set forth in the exhibit identified in the record as Court Exhibit 1, pages 1 through 9, marked by the Court for identification and dated March 20, 2008, which exhibit is attached hereto and incorporated herein by reference, were either stipulated to by the parties; or if not agreed to, are incorporated as findings of this court.

10. SANDRA GRAVES paid attorneys' fees and expenses to attorneys and expert witnesses in these proceedings from community assets (monies) in excess of $1,000,000.00 (one million dollars). The Court finds that these payments violated the parties TRCP Rule 11 Agreed Temporary Orders and was a contempt of such Order.

11. Attorneys fees and expenses incurred in excess of those sums found in jury question number 17 ($540,000.00) with respect to Sandra Graves' expenditures are found to be a waste of community assets and a violation of the parties agreements including a violation of the courts Agreed Temporary Orders.

Insofar as this misconduct relates to discovery, we cannot determine from the record before us whether Tomlinson obtained pre-trial rulings as required under the

*Remington Arms* case. *See* 850 S.W.2d at 170. We cannot determine whether some or all of the discovery abuse encompassed by these findings was revealed for the first time during or after trial. *See id.* We cannot determine which portion of the global $250,000 sanction relates to the discovery misconduct referred to in findings of fact numbers 2 through 11, and we cannot determine whether that portion bears a reasonable relationship to the misconduct. *See TransAmerican*, 811 S.W.2d at 917.

Similarly, we cannot determine which portion of the global $250,000 sanction award is attributable to non-discovery-related misconduct. *TransAmerican* demands (1) a direct relationship between the amount of sanctions and the sanctionable conduct; and (2) that the sanctions not be excessive. *See TransAmerican*, 811 S.W.2d at 917; *see also Campbell*, 2010 WL 2477782, at *6. On this record, we cannot assess whether these requisites have been satisfied.

The trial court's global sanctions award must be reversed and remanded for further proceedings consistent with the standards discussed above. *See TransAmerican*, 811 S.W.2d at 917–18; *Remington Arms Co.*, 850 S.W.2d at 170–71. Accordingly, we sustain Graves's third issue.[6]

### E. Just and Right Property Division

In her fourth issue, Graves argues that the trial court's property division was not just and right. She contends that the trial court abused its discretion in determining the scope of community property to be divided because the evidence (1) does not support the jury's finding that 40 percent of the farm and ranch equipment was

---

**6.** Though the trial court erred in making the sanctions award in the form that it did, we do not address the substance of the sanctions order or the propriety of assessing sanctions based on the conduct to which the trial court referred.

Tomlinson's separate property; (2) shows that the jury overvalued All The Little Things Count and All The Little Things Count, LLC; (3) supports the jury's finding that Tomlinson's debts to his parents of $239,000 were constructively fraudulent or waste; and (4) establishes the trial court disregarded Graves's unpaid debts of $305,369 and unpaid attorney's fees of $225,841.[7]

In light of our disposition of Graves's first and second issues, we address only whether the trial court abused its discretion in making its "just and right" division by relying on the jury's finding that 40 percent of the parties' farm and ranch equipment was Tomlinson's separate property.

■ In a divorce decree, the trial court "shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party." Tex. Fam.Code Ann. § 7.001 (Vernon 2006). To disturb the trial court's division of property, Graves must show the trial court clearly abused its discretion by a division or an order that is manifestly unjust and unfair. *Sharma v. Routh*, 302 S.W.3d 355, 360 (Tex.App.-Houston [14th Dist.] 2009, no pet.); *Stavinoha*, 126 S.W.3d at 607. Under this abuse of discretion standard, the legal and factual sufficiency of the evidence are not independent grounds of error; they are relevant factors in assessing whether the trial court abused its discretion. *Sharma*, 302 S.W.3d at 360; *Stavinoha*, 126 S.W.3d at 608.

■ We must remand the entire community estate for a new division when we find reversible error that materially affects the trial court's just and right division of the property because only the trial court may make a just division of community property. *Stavinoha*, 126 S.W.3d at 608; *McElwee v. McElwee*, 911 S.W.2d 182, 189 (Tex.App.-Houston [1st Dist.] 1995, writ denied). The appellate court determines only whether the trial court abused its discretion in making the division. *McElwee*, 911 S.W.2d at 189.

■ Having concluded above that the evidence is legally insufficient to support a characterization of the farm and ranch equipment as Tomlinson's separate property, we now consider whether this characterization caused the trial court to abuse its discretion in making its property division.

■ If the trial court characterizes community property as separate property, then the property does not get divided as part of the community estate. *Id.* If the mischaracterized property has value that would have affected the trial court's just and right division, then the mischaracterization is harmful and requires the appellate court to remand the entire community estate to the trial court for a just and right division of the properly characterized community property. *Stavinoha*, 126 S.W.3d at 617; *McElwee*, 911 S.W.2d at 189. If, on the other hand, the mischaracterized property had only a *de minimis* effect on the trial court's just and right division, then the trial court's error is not an abuse of discretion. *Stavinoha*, 126 S.W.3d at 617; *McElwee*, 911 S.W.2d at 189.

Characterizing 40 percent of the farm and ranch equipment as Tomlinson's separate property means the trial court did not consider at least $134,000 in community

---

7. Graves also stated, "And, as explained under Issue Number Three, the sanction award, if it is allowed at all, should be reduced to $349.25, if not zero." In light of our disposi-tion of Graves's third issue, we need not ad-dress her assertion with respect to the sanc-tions award.

property in dividing the community estate.[8] We agree with Graves that failing to consider $134,000 in dividing the community estate has more than a *de minimis* effect on the trial court's just and right division. The trial court's characterization materially affected the court's just and right property division, requiring reversal and remand of the entire community estate to the trial court for a just and right division of the properly characterized community property. Accordingly, we sustain Graves's fourth issue.

### F. Court–Appointed Auditor's Fees

■■■ In her fifth issue, Graves asserts that the trial court erred by making Graves "liable for half of the unpaid auditor's fees of $42,851." Graves claims that "[b]y agreed court order, the auditor's fee was to be split 50–50, and [Graves] has already paid more than her half of the total fee. The Divorce Decree and Judgment for Expert Witness Fees result in [Graves] having to pay all or three quarters of the fee, in violation of the agreed court order." [9]

By agreement of the parties, the trial court appointed CPA Rice on March 10, 2006 to serve as independent auditor and conduct an unlimited audit of all the parties' personal and business assets. In the agreed discovery order, the trial court ordered the "Parties to split Receiver and Independent Auditor fees 50/50." Rice incurred fees of $94,780.35, and Graves paid $51,929.35 before trial to two firms Rice worked for during the proceedings. After the jury trial, the parties discussed pay-

ment of the auditor's fees at several post-trial hearings.

At the February 4, 2008 post-trial hearing, Graves asked the trial court to order Tomlinson to pay the remaining auditor's fees out of his community estate share. At the March 20, 2008 post-trial hearing, Graves again requested the trial court to order Tomlinson to pay the remaining auditor's fees out of his community estate share. The trial court stated, "Whatever he has not paid to this point, he needs to payout [sic] of his division." Tomlinson objected and argued that whatever amount Graves paid in auditor's fees to date had been paid with community property.

At the March 27, 2008 post-trial hearing, the parties again discussed the payment of the auditor's fees. At the end of the hearing the trial court stated, "All right. Well, whatever costs are not in the jury award will be the liability of the parties themselves and Bryan Rice's fees will stay the same as it always was, to be divided evenly between the parties."

Bryan Rice and the two firms he worked for while serving as the court-appointed auditor filed a petition in intervention for expert witness fees on April 7, 2008. The trial court held another post-trial hearing the next day. Tomlinson argued that "we are being charged Bryan Rice's fees as court costs which we have to pay out of his half award, not from the community property as our Rule 11 agreement had said that we were each going to pay 50 percent

---

8. The farm and ranch equipment was valued at $335,000. Forty percent of $335,000 equals $134,000.

9. Graves also argues that auditor Bryan Rice "accepted work under this agreed order, acknowledged the 50/50 split set out in this Order, and even secured a money judgment based on the Order;" therefore, Graves con-

tends that Rice is bound by the order on quasi estoppel grounds under *Stable Energy, L.P. v. Newberry*, 999 S.W.2d 538, 548 (Tex.App.-Austin 1999, pet. denied). We do not address Graves's quasi estoppel argument because it was not raised in the trial court. *See* Tex. R.App. P. 33.1.

of it, which would have been a community property liability."

The trial court also addressed the petition in intervention filed by Rice and the firms. The parties agreed that a separate judgment should be signed awarding $42,851 in favor of Rice and the two firms, but the parties continued arguing about who should pay those fees:

> TOMLINSON'S COUNSEL: According to the Rule 11 agreement, it should be a community liability, Judge. Each one of them was to pay 50 percent of it out of the community. That was the community agreement. Now Mike is getting charged that out of his separate portion. It's just not fair. She's had access to all of these funds. She's spent millions dollars during this proceeding.
>
> GRAVES'S COUNSEL: I'm going to object to all that, Your Honor.
>
> THE COURT: Well, it's coming from community; and she's getting half the community and he's getting half the community.
>
> TOMLINSON'S COUNSEL: No, it's not coming from the community. It's coming out of his one half which will be separate property. He wasn't given that as a liability. He wasn't credited that. That would be a community liability if it were coming out of the community. You didn't have that as—
>
> COURT: I understand what you are saying.
>
> TOMLINSON'S COUNSEL: Yeah.
>
> COURT: And I think you are right. I think it needs to be paid before we divide up the community.
>
> TOMLINSON'S COUNSEL: Right. There you go.

The trial court then instructed counsel for Rice and the firms to draft a separate judgment assessing the auditor's fees one half against Tomlinson and one half against Graves.

At the April 15, 2008 post-trial hearing, Graves objected to the trial court signing a separate judgment in favor of Rice and the firms making Tomlinson and Graves jointly and severally liable for the auditor's fees. Nevertheless, the trial court signed the separate judgment.

We disagree with Graves's assertion that "The Divorce Decree and Judgment for Expert Witness Fees result in [Graves] having to pay all or three quarters of the fee." Graves does not dispute Tomlinson's assertion that Rice's fees have been paid using only community property, and that community property is equally owned by a husband and wife during their marriage. Because community property was used to pay Rice, the fact that Graves is the only one who has paid Rice and the firms to date does not establish that she paid more than half of the fees. We cannot conclude that Graves would pay a disproportionate amount of the auditor's fees under the trial court's divorce decree and judgment for expert witness fees. Further, we cannot agree with Graves that ordering the parties to pay the remaining auditor's fees equally would be unfair or contrary to the March 10, 2006 order.

We conclude that the trial court did not err by ordering the auditor's fees be paid jointly and severally by Tomlinson and Graves. We overrule Graves's fifth issue.

### G. Interest on Appellate Attorney's Fees

 In her sixth issue, Graves asserts that the divorce decree "levies interest on all of [Tomlinson's] appellate fees beginning on the date the appeal is perfected." Citing *Southwestern Bell Telephone Co. v. Vollmer*, 805 S.W.2d 825, 834 (Tex.App.-Corpus Christi 1991, writ denied), and *Republic National Life Insurance Co. v.*

*Beard*, 400 S.W.2d 853, 859–60 (Tex.Civ. App.-San Antonio 1966, writ ref'd n.r.e.), Graves asserts that "Under Texas law, the starting date for interest on appellate attorneys fees is the date appeal is taken in the particular appellate court."

Graves did not object to or otherwise raise her complaint through a post-trial motion regarding the accrual of interest in the trial court. Therefore, we do not address it. Tex.R.App. P. 33.1; *Marsalise v. Wallace*, No. 03–04–00277–CV, 2005 WL 1116010, at *1 (Tex.App.-Austin May 12, 2005, no pet.) (mem.op.).

We overrule Graves's sixth issue.

### H. Omitted Liabilities and Omitted Property Provisions

In her seventh issue, Graves contends that the trial court's decree "erroneously awarded to the opposing party all property 'not fully disclosed' by one party to the opposing party, as of the date of divorce, and required the party incurring a debt not mentioned in the decree of divorce to pay that debt."

■■■ Graves contends that the decree's "omitted liabilities" provision "collides with [Texas Family Code] Section 9.201, and violates the requirement of a just and right division based on the equities." As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion stating the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint. Tex. R.App. P. 33.1(a)(1). The record does not reflect that Graves raised a complaint in the trial court regarding the decree's omitted liabilities provision; therefore, Graves has not preserved her complaint for appellate review. *See id.*

Graves also contends that the decree's "omitted property" provision should be eliminated because it "does not limit its effect to community property, and therefore may award omitted separate property to the other spouse in violation of Texas Family Code § 7.001." Graves contends that there "was no opportunity for either party to disclose property that came into being" between "the close of evidence" on January 28, 2008 and April 16, 2008 when the trial court signed the divorce decree. Graves challenged the omitted property provision in her post-trial motions.

■■■ The omitted property provision provides: "Any property or asset omitted from a party's inventory and appraisement or otherwise not fully disclosed to the opposing party is awarded to such opposing party, to the extent of such omission, based on the greater of the valuation of such property on the date of divorce or the date of discovery of the asset by the aggrieved party."

■■■ In a divorce decree, "the court shall order a division of the estate of the parties ... having due regard for the rights of each party." Tex. Fam.Code Ann. § 7.001. In making its division, the trial court may not divest one party of his separate property. *See Cameron v. Cameron*, 641 S.W.2d 210, 215 (Tex.1982); *Osborn v. Osborn*, 961 S.W.2d 408, 414 (Tex. App.-Houston [1st Dist.] 1997, writ denied). Indeed, divestiture of separate property by the trial court is contrary to the Texas Constitution. *See Cameron*, 641 S.W.2d at 213; *Anderson v. Anderson*, 282 S.W.3d 150, 155 (Tex.App.-El Paso 2009, no pet.). Separate property commands constitutional stature: "All property, both real and personal, of a spouse owned or claimed before marriage, and that acquired afterward by gift, devise or descent, shall be the separate property of that spouse." Tex. Const. art. XVI, § 15; *Zagorski*, 116

S.W.3d at 316. Only community property is subject to the trial court's just and right division. *Osborn,* 961 S.W.2d at 413–14.

We agree with Graves that the trial court erred by including the omitted property provision in the divorce decree to the extent that the provision has or may have the effect of awarding one spouse's separate property to the other spouse. Accordingly, we sustain Graves's seventh issue and remand for further consideration in conjunction with the trial court's just and right division. Accordingly, we sustain Graves's seventh issue.

## II. Tomlinson's Cross–Appeal

We now address Tomlinson's cross-appeal.

### A. Sufficiency of the Evidence

In his second issue, Tomlinson raises ten sub-issues challenging the legal and factual sufficiency of the evidence supporting numerous jury findings adverse to him. All of the findings challenged by Tomlinson are governed by the preponderance of the evidence standard, and we apply the same sufficiency and preservation standards discussed above in connection with Graves's appeal.[10]

### 1. Fair market value

■ In his first and second sub-issues, Tomlinson argues that no evidence was presented at trial regarding "the fair market value of any cattle, horses, or farm equipment" in Tomlinson's possession to support the jury's finding in Question number 4 that the value of the cattle and horses was $170,000 and the value of the farm equipment was $335,000. Tomlinson argues that Graves's expert, Eric Brast,

"testified as to value, but not as to fair market value."

At trial, Brast valued the cattle at $208,300, the horses at $25,950, and the farm equipment at $486,650. Tomlinson's attorney asked Brast: "Now, you've given some pretty large numbers, haven't you, sir? And your opinions here have been good sized numbers, haven't they?" Brast responded, "They're fair estimates of fair market value, sir." Brast also stated, "I have real-time market values for the animals." When discussing the value of cattle semen, Brast testified, "I gave it a fair market value for properly managed semen." When asked to summarize his Executive Summary, Brast stated, "The Executive Summary reiterates the values that I found to be the appraised values, fair market values, of those animals and equipment at that point in time."

During his testimony, Brast did not continuously invoke the term "fair market value." After reviewing Brast's testimony in its entirety, we nonetheless conclude the jury reasonably could have concluded that Brast's valuation of the cattle, horses, and farm equipment was based on fair market value. Accordingly, we conclude that there was sufficient evidence as to the fair market value of cattle, horses, and farm equipment. We overrule Tomlinson's sub-issues one and two.

### 2. Purchase of Rosenberg building

■ In his third sub-issue, Tomlinson contends that the jury erred in failing to find that Graves committed fraud with respect to the purchase by Graves's son, Charles Babb, of a building located at 1117 Lawrence in Rosenberg, Texas. Tomlinson contends that: (1) the evidence conclusively established that Graves committed

10. Tomlinson's first issue focused on judicial estoppel, which is inapplicable for reasons already discussed.

fraud; and (2) the jury's failure to find that Graves committed fraud "possibly re-sult[ed] in the erroneous exclusion of $200,000 from reimbursement by Sandra Graves to the community estate." Tomlinson claims that Graves provided Charles with $200,000 to purchase the Rosenberg building in his name.

At trial, Graves testified repeatedly that she did not help Charles buy the Rosenberg building and did not "give him any money through any type of transfer, back-door transfer, front-door transfer, through All The Little Things Country, cash, what-ever." Graves testified that Charles's fa-ther and uncles helped Charles buy the building. Graves acknowledged that All The Little Things Country uses the Rosen-berg building free of charge, and that All The Little Things Count pays taxes and insurance on the building.

Graves testified that she gave Charles a $2,000 check in lieu of paying him for work he performed, and that Charles used the check as earnest money to purchase the Rosenberg building. Graves also testified that (1) she gave Charles's father a check for $70,189.02 to pay for work he had performed for Graves; and (2) Charles's father "wanted the money used for Charlie to buy the building." Graves testified that "what [she] wanted the jury to understand was—is that we bought the building for the clients but that [she] didn't directly give the money to [her] son to buy that building."

Charles testified that Graves gave him a $2,000 check he used as earnest money to purchase the building; he also stated the $2,000 check "was payment, which was owed to me for working." Charles testi-fied that he met with his mother on the day of closing and that she gave him $200,000 in cashier's checks; he also testi-fied that he received $200,489.94 to pay for the Rosenberg building from his father

and his father's side of the family. Charles testified that Graves has never given him a gift in excess of $5,000. Charles denied that he is holding the building for Graves's benefit until the di-vorce is over "to keep [Tomlinson] from getting any part of it."

Based on the record before us, we reject Tomlinson's assertion that the evidence conclusively establishes that Graves com-mitted fraud with respect to the purchase of the Rosenberg building. The record contains conflicting testimony, and the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See Golden Eagle Arch-ery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex.2003). We overrule Tomlinson's third sub-issue.

### 3. $100,000 payment to Graves's father

In his fourth sub-issue, Tomlinson argues that the jury erred in failing to find that Graves committed fraud with respect to a $100,000 payment she made to her father during the marriage in June 2003. Tomlinson argues that the jury's failure to find fraud "possibly" resulted "in the erro-neous exclusion of $100,000 from reim-bursement by Sandra Graves to the com-munity estate."

In support of his fourth sub-issue, Tom-linson states as follows: "In June 2003 Sandra Graves paid her father $100,000 to reimburse him for all of the money he had given her during her days as a single mother and prior to her marriage to Mi-chael Tomlinson. This evidence conclu-sively establishes a separate property debt paid with community property."

The jury charge defined fraud as fol-lows: "A spouse commits fraud if that spouse transfers community property or expends community funds for the primary purpose of depriving the other spouse of

the use and enjoyment of the assets involved in the transaction. Such acts involve dishonesty of purpose or intent to deceive."

Graves's $100,000 payment to her father "to reimburse him for all of the money he had given her during her days as a single mother and prior to her marriage to Michael Tomlinson" may establish that Graves repaid a separate property debt during her marriage. It does not, however, conclusively establish fraud because it does not establish that Graves expended "community funds for the primary purpose of depriving ... [Tomlinson] of the use and enjoyment of the assets involved in the transaction."

Accordingly, we overrule Tomlinson's fourth sub-issue.

### 4. Fraud or waste relating to horses, cattle, and farm equipment

■ In his fifth, sixth and seventh sub-issues, Tomlinson asserts that the jury erred in finding he committed constructive fraud or waste with respect to his and Graves's community property rights relating to horses, cattle, equipment, and implements. Tomlinson contends that the only testimony as to Tomlinson's waste came from Graves's expert, Eric Brast. Tomlinson argues that, because Brast had seen "these items on one occasion, November 10, 2007," and "did not testify as to how long Michael Tomlinson had been in possession of these three items or their condition at any time prior to this one day of viewing the cattle, horses, and farm equipment[,]" it was impossible for "Brast to determine that these three items had diminished in value."

Brast testified at trial that the waste totaled $9,900 with respect to the cattle; $19,000 with respect to the horses; and $20,308 with respect to the equipment. Brast attributed the loss in the value of

the animals to poor animal husbandry practices, and opined that waste would not have occurred but for the acts of Tomlinson. Brast testified that some of the horses had halters growing into their flesh. He testified that the horses were malnourished.

Brast estimated that the equipment's value declined by four percent because it was left unsheltered, was not covered with a tarp, and was not maintained. Brast stated, "I only saw the equipment that I was shown by Mr. Tomlinson but the equipment was unshedded, outdoors, grown up in weeds. No one had made an effort to try to protect the equipment. It didn't look as though it had been maintained, as far as greasing equipment, greasing disks, trying to keep coulters on disks moving so that they work when you actually go to try to put them in the ground and plant something. It looked in a state of mismanagement at best."

Brast testified that Tomlinson had a responsibility to tell him about any "unique" or "important" information, and that Tomlinson also had a responsibility to inform Brast if equipment was functional, especially because some of the equipment was "exceedingly hard to get to because of the way [it] had been taken care of." To illustrate Tomlinson's mismanagement and poor animal husbandry practices, Brast showed the jury several photos of the cattle, horses, and equipment.

Tomlinson does not deny responsibility for the condition of the animals or the equipment; rather, Tomlinson defends the condition of the animals and equipment. To explain the condition of the horses, Tomlinson stated that they were pasture horses that were supposed to live off the land. He testified that Brast did not understand that his horses were pasture horses rather than stalled horses, and that

he hasn't "neglected anything." Tomlinson also testified that the horses in Brast's pictures did not look starved. With respect to the cattle, Tomlinson disagreed with Brast and stated that his cattle are in "excellent shape." He also testified that one cannot build barns to store equipment on leased land, and that it is customary to leave equipment "out in the open."

Tomlinson never asserted that the equipment and animals at issue were in someone else's care during the divorce proceedings. Nor does Tomlinson claim that Brast's conclusion of waste is unreliable or questionable because the animals and equipment had been in the same or similar condition during the marriage or during the divorce proceedings. Brast's testimony presented sufficient evidence supporting the jury's finding that Tomlinson committed constructive fraud or waste. We overrule Tomlinson's fifth, sixth, and seventh sub-issues.

### 5. Funds from farming and ranching operations

■ In his eighth sub-issue, Tomlinson contends that there is factually insufficient evidence to support the jury's finding that he committed constructive fraud or waste in the amount of $767,000 with respect to his and Graves's community property rights in the farming and ranching operations.

Because Tomlinson did not file a motion for new trial, he is precluded from asserting a challenge to the factual sufficiency of the evidence. *See* Tex.R. Civ. P. 324(b)(2); *Cecil*, 804 S.W.2d at 510. On appeal, Tomlinson briefed only a factual sufficiency challenge; he does not challenge the jury's finding on legal sufficiency grounds. Accordingly, we overrule Tomlinson's eighth sub-issue.

### 6. Transfer of assets to AH The Little Things Country

■ In his ninth sub-issue, Tomlinson argues that the jury erred by finding that Graves did not commit constructive fraud or waste by transferring assets from her proprietorship and LLC to the non-profit corporation All The Little Things Country. He contends that the evidence conclusively establishes that Graves committed fraud or waste with respect to these transfers. Tomlinson does not specify any particular assets in connection with this argument.

Tomlinson asserts that the following evidence conclusively shows Graves committed fraud or waste:

It is undisputed that the two for-profit companies would submit invoices to the State of Texas for services which it would certify were performed by the for-profit companies. All the Little Things Country (a non-profit corporation) would then send a monthly bill to All The Little Things Count (without distinguishing between the sole proprietorship or the LLC).... Occasionally, All the Little Things Count would send a bill to itself. There was no evidence that All the Little Things Country (a non-profit corporation) did anything but invoice the for-profit companies.... Charity is a wonderful thing except Sandra Graves arranged for the All the Little Things Country (a non-profit corporation) to benefit Sandra Graves as it was convenient. For example, her son drove the All the Little Things Country (a non-profit corporation)'s Ford Expedition for his personal use.

At trial, Graves testified that All The Little Things Country has several facilities providing services for All The Little Things Count; All The Little Things Count, LLC; Volunteers of America; the Gulf Coast Mental Retardation Authority; the Harris County Mental Retardation Au-

thority; and other entities. All The Little Things Country has its own employees and pays these employees on its own. All The Little Things Country bills for the services it provides to All The Little Things Count and All The Little Things Count, LLC.

All The Little Things Count and All The Little Things Count, LLC transferred several vehicles to All The Little Things Country, and Graves testified that this transfer of assets constituted compensation for services rendered. In particular, Graves testified that "those vehicles were transferred over to Country; but it was deducted off the invoice that was owed to Country. Instead of being paid in dollars, we paid them in vehicles because they're the ones who needed the vehicles."

The court-appointed auditor, Bryan Rice, also testified regarding several transactions between All The Little Things Count, All The Little Things Count, LLC and All The Little Things Country. In response to a question from Graves's attorney asking whether he found any transfers between these entities to be improper, Rice testified: "I found them to be routine, something that had been going on since 2000, and I saw nothing improper about it." Rice also stated that "money was transferred to Country, the reason being, Country provides services to Count."

There is no evidence in the record that Graves's son drove a Ford Expedition at any time; nor does the record establish that such a vehicle was ever owned by All The Little Things Country.

In light of the record before us, we conclude that legally sufficient evidence supports the jury finding that Graves did not commit fraud or waste with regard to any asset transfers to All The Little Things Country. Furthermore, the evidence does not conclusively show Graves committed fraud or waste. We overrule Tomlinson's ninth sub-issue.

### 7. Attorney's fees

In his tenth sub-issue, Tomlinson contends that the jury's failure to find that Graves committed fraud or waste in the payment of attorney's fees "possibly result[ed] in the community estate not being reimbursed by Sandra Graves in the amount of $460,000 ($1,000,000 less $540,000)." In support of his sub-issue, Tomlinson states the following in his brief:

> Bryan Rice noted $199,797.83 in expenditures from All the Little Things Count to pay Sandra's non-business attorney fees and other professional fees related to this divorce from the time of filing on June 14, 2005 to March 1, 2006. Gregory R. Schuelke testified that for the first eleven months of 2007 Sandra Graves spent $353,801 in non-business attorney fees and other professional fees related to this divorce. The two together exceed $550,000 and does not include ten months in 2006, one month in 2007, or the trial.
>
> The Trial Court found as a fact that Sandra Graves paid attorneys and expert witnesses in this cause in excess of one million dollars ($1,000,000) and that this was a violation of and a contempt of the Court's Temporary Orders. (citations to record omitted).

This evidence does not establish that Graves committed constructive fraud or waste because it does not establish that Graves's expenditures were "capricious, excessive or arbitrary resulting in unfairness to" Tomlinson as required by the jury charge. Accordingly, we overrule Tomlinson's second issue.

### 8. Tomlinson's debt to his parents

In his fourth issue, Tomlinson argues that there is legally and factually insufficient evidence to support the jury's finding that he committed constructive

fraud or waste "with respect to his and Sandra's community property rights by incurring indebtedness and encumbering community property in favor of his parents, possibly resulting in the erroneous reimbursement by Michael Tomlinson of the community estate in the amount of $239,000."

The trial court granted Tomlinson's motion to disregard the jury's answer in Question Eleven, which asked, "Did MIKE commit constructive fraud/waste with respect to his and Sandra's community-property rights by incurring indebtedness and encumbering community property in favor of his parents?" Therefore, the jury's finding was not a part of the formation of the divorce decree. The jury's finding could not have "possibly result[ed] in the erroneous reimbursement by Michael Tomlinson of the community estate in the amount of $239,000." Tomlinson acknowledges this in his brief: "The Trial Court used its authority ... to determine that Michael's indebtedness to his parents was a bona fide debt and not a fraud on the community estate; therefore, not subject to reimbursement."

Accordingly, we overrule Tomlinson's fourth issue.

### B. Charge Error

In his third issue, Tomlinson complains that the trial court erred by refusing to submit "an issue on combining the value of All the Little Things Count, L.L.C. and All the Little Things Country (a non-profit corporation) to the extent the later is used by Sandra Graves to reduce [Tomlinson]'s interest in the community estate as tendered by Michael Tomlinson." In support of his assertion that the trial court erred by refusing to submit his proposed jury question, Tomlinson states in his brief: "There was more than a scintilla of evidence of the co-mingling of the assets including the income of All the Little Things Count, L.L.C. to justify the submission of such Question to the Jury."

A party is entitled to a jury question, instruction, or definition if the pleadings and evidence raise an issue. Tex.R. Civ. P. 278; *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex.2002). The goal of the jury charge is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663–64 (Tex.1999). Toward that end, the trial court enjoys broad discretion so long as the charge is legally correct. *See id.*

A judgment will not be reversed for charge error unless the error was harmful because it probably caused the rendition of an improper verdict or probably prevented the party from properly presenting the case to the appellate courts. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009). Charge error is generally considered harmful if it relates to a contested, critical issue. *Id.*

Tomlinson does not cite any authority to support his assertion that the trial court erred by refusing to submit his proposed question to the jury. We conclude that Tomlinson has waived this issue by failing to provide sufficient argument and analysis. *See* Tex.R.App. P. 38.1(i). We overrule Tomlinson's third issue.

### Conclusion

We affirm the portion of the trial court's divorce decree granting the divorce. We reverse the portion of the trial court's divorce decree imposing sanctions against Graves and remand the case for further proceedings with respect to sanctions consistent with the standards discussed in this opinion. We reverse the portion of the

decree dividing the marital estate and remand the case to the trial court to conduct a just and right division in light of this court's determination that (1) $134,000 in farm and ranch equipment cannot be characterized on this record as Tomlinson's separate property; and (2) the omitted property provision is improper as written.

We affirm the trial court's judgment awarding fees in favor of the court-appointed auditor Bryan Rice, and the firms Hartman Leito & Bolt, LLP, and Rice Stewart Faris & Co.

SULLIVAN, J., not participating.