

# NUMBER 13-11-00056-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**CYNTHIA LEE TUCKER,**                                    **Appellant,**

**v.**

**TROY WILLIAM TUCKER,**                                    **Appellee.**

### On appeal from the 267th District Court
### of Victoria County, Texas.

# MEMORANDUM OPINION

### Before Justices Rodriguez, Benavides, and Perkes
### Memorandum Opinion by Justice Perkes

Appellant, Cynthia Lee Tucker ("Cyndie"), appeals from the Final Decree of Divorce entered in her divorce suit against appellee, Troy William Tucker ("Troy"). By three issues, Cyndie argues that the trial court abused its discretion in disposing of the couple's assets because it failed to find (1) Troy created a fraudulent debt to his mother of $4,000,000 in community funds; (2) a fifty-percent interest in Tucker Operating Company was community

property; and (3) that the community estate should be reimbursed for Troy's payment of $547,634.69 for his attorney's and expert fees.   We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[1]

Cyndie and Troy were married on August 21, 1993.   It is undisputed that Cyndie had two affairs, the first of which Troy learned about in 2005.   After the first affair, Troy and Cyndie participated in counseling, made lifestyle changes, and believed their marriage was strong.   In January of 2009, Cyndie met another man with whom she then had an ongoing affair.   Cyndie concealed this affair from Troy until August 2009.   While Cyndie and Troy were on a trip to Mexico to celebrate their wedding anniversary, Troy discovered Cyndie was communicating with the other man during their trip.   In Cyndie's own words from her trial testimony, Troy ". . . was completely devastated and crushed beyond anything he could ever imagine. . . He feels he had lost his family."[2]   After failed attempts to reconcile, Cyndie filed suit for divorce on January 4, 2010.   Troy countersued for a divorce from Cyndie.

## A.    Fifty Percent Ownership Interest in Tucker Operating Company

When Troy and Cyndie married, Troy worked for Tucker Operating Company with his father, Tommy Tucker.   Originally, Tommy and his business partner, Jon Nelson, wholly owned Tucker Operating Company in equal shares.   In 1980, Tommy purchased all of Jon's ownership interest in Tucker Operating Company.

On January 1, 1992, Troy purchased a 50% ownership interest (500 shares) in Tucker Operating Company from Tommy, as evidenced by a promissory note.    The stock

---

[1]   Because this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it.   *See* TEX. R. APP. P. 47.4.

[2]   Two children were born of the marriage, but no issue concerning the children has been presented on appeal.

2

transfer from Tommy to Troy was not recorded on the company's stock ledger until a date after the present divorce litigation started. Troy's mother, Rosemary Tucker, recorded the stock transfer for Troy when it came to her attention that the stock ledger was not updated to reflect the 1992 transfer of shares to Troy. Based on conflicting evidence in the record, such as Tucker Operating Company's tax returns showing Tommy owned 100% of Tucker Operating Company in 2005 and Troy owned 100% of Tucker Operating Company between 2007 and 2009, Cyndie argued in the trial court that the 50% interest in Tucker Operating Company was community property subject to an equitable division in the divorce, rather than Troy's separate property acquired before marriage.

**B.      Troy's 2005 Conversation with Financial Planner, Steven Orr**

After learning of Cyndie's affair in 2005, Troy had a meeting with Steven Orr, a close friend the couple met through church. Orr was a financial planner. Troy admitted that he met with Orr when he was very hurt, and that they discussed how to hide money from Cyndie in the event of a divorce. Orr confirmed this conversation and testified that at the time of their meeting, Troy expressed an interest in hiding millions from Cyndie in the event of a divorce. Orr told Troy that he knew an American with Swiss contacts who could help a person keep money "off shore." The record, however, further shows that the men also discussed legitimate financial-planning activities and the possibility of Troy entering a business deal with his mother. There is no evidence that Troy contacted the man with Swiss contacts. Orr testified that he did not help Troy hide any money. Orr also testified that Cyndie called him and asked how to "get income from money" and "how to protect her funds because of the divorce situation."

3

**C.      Community's Purchase of a 20% Interest in Edde Drilling for $4,000,000**

In 1997, Troy and Tommy formed Edde Drilling Company, Inc.   In December, 2005, it was converted to Edde Drilling Company, L.L.C. ("Edde Drilling").   On September 11, 2005, Tommy died, following a three-year illness.   Rosemary disclaimed a 20% interest in Edde Drilling that she would have inherited from her husband, Tommy.   That interest passed to Troy as his separate property.[3]   On June 1, 2006, Troy purchased Rosemary's remaining 20% ownership interest in Edde Drilling, pursuant to a "Membership Units Purchase Agreement" ("Purchase Agreement").   The purchase price was $4,000,000, to be paid to Rosemary in two $60,000 payments per year.   At trial, Cyndie argued that the $4,000,000 debt to Rosemary was concocted to diminish community funds, and that the actual value of a 20% interest in Edde Drilling was far less than $4,000,000.

**D.      Relevant Findings of Fact and Conclusions of Law**

The trial court concluded that Troy's 50% ownership interest in Tucker Operating Company was acquired before he married Cyndie, and that it was his separate property. Relevant to the purchase of Rosemary's ownership interest in Edde Drilling, the trial court concluded that Troy did not commit actual or constructive fraud on the community estate.   The trial court's findings, together with the Decree, reflect that "the trial court awarded 60% of the community to Troy and 40% to Cyndie."[4] The trial court further concluded that Troy should be granted a divorce from Cyndie on the ground of her adultery, and that the division of the assets and liabilities of the parties, as set forth in the Decree, is a just and right division of the estate of

---

[3] The separate-property character of the interest in Edde Drilling Company, L.L.C. inherited from Tommy Tucker is unchallenged on appeal.

[4] Appellant submitted a table with her brief that shows the trial court's disposition of the assets and liabilities, the value of the assets and liabilities, and the percentages awarded to the parties.   Appellant asserts in her brief, as shown in her table, that the trial awarded 60% of the community to Troy and 40% to Cyndie.

4

the parties in compliance with section 7.001of the Texas Family Code. In conjunction with these conclusions of law, the trial court made the following findings of fact:

9. The Court finds that Petitioner, Cynthia Lee Tucker, committed adultery.

48. The Court finds that the parties acquired a 25% ownership interest in Edde Drilling Company, L.L.C. during the parties' marriage.

49. The Court finds that the fair market value of the 25% ownership interest in Edde Drilling Company, L.L.C. is $2,183,000.00.

107. The Court finds that Cynthia Lee Tucker has incurred expenses for litigation including attorney fees and expert witness fees which remain unpaid in the amount of $364,255.48.

110. The Court finds that Troy William Tucker has incurred expenses for litigation including attorney fees and expert witness fees which remain unpaid in the amount of $99,902.22.

111. The Court finds that Troy William Tucker is indebted to Rosemary Tucker pursuant to the terms of the "Membership Units Purchase Agreement" executed by Troy William Tucker and Rosemary Tucker dated June 1, 2006.

113. The Court finds, by clear and convincing evidence, that Troy William Tucker acquired a 50% ownership interest in Tucker Operating Company, Inc.

114. The Court finds, by clear and convincing evidence, that Troy William Tucker's 50% ownership interest in Tucker Operating Company, Inc. was acquired prior to the date of the parties' marriage.

115. The Court finds that Troy W. Tucker did not transfer community property of the parties for the primary purpose of depriving Cynthia Lee Tucker of the use and enjoyment of the assets involved in the transaction.

116. The Court finds that Troy W. Tucker did not expend community funds of the parties for the primary purpose of depriving Cynthia Lee Tucker of the use and enjoyment of the funds involved in the transfer.

117. The Court finds that Troy W. Tucker did not fail to act with the highest degree of good faith with respect to the community property interests of Cynthia Lee Tucker.

118. The Court finds that Troy W. Tucker did not fail to act with due regard for Cynthia Lee Tucker's community property interests.

119. The Court finds that Troy W. Tucker did not make excessive gifts of community assets to third parties at a time when he knew, or should have known that Cynthia Lee Tucker would object.

## II.  STANDARD OF REVIEW

In a divorce case, we review a trial court's division of the marital estate for an abuse of discretion. *Loaiza v. Loaiza*, 130 S.W.3d 894, 899 (Tex. App.—Fort Worth 2004, no pet.); *Zorilla v. Wahid*, 83 S.W.3d 247, 251 (Tex. App.—Corpus Christi 2002, no pet.), *disapproved on other grounds, Iliff v. Iliff*, 339 S.W.3d 74 (Tex. 2011).  A trial court has broad discretion in dividing the marital estate, and we presume the trial court exercised its discretion properly. *Loaiza*, 130 S.W.3d at 899 (citing *Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex. 1981)).  This Court will correct the trial court's division of marital property only when an abuse of discretion has been shown. *Id.* (citing *Massey v. Massey,* 807 S.W.2d 391, 398 (Tex. App.—Houston [1st Dist.] 1991), *writ denied*, 867 S.W.2d 766 (Tex. 1993)).  It is this Court's duty to consider every reasonable presumption in favor of the proper exercise of discretion by the trial court in dividing the community estate. *Murff*, 615 S.W.2d at 698; *Massey*, 807 S.W.2d at 398.  To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles or whether the act was arbitrary or unreasonable. *See Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex. 2002); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex. 1985).  A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support its decision. *Knight v. Knight*, 301 S.W.3d 723, 728 (Tex. App.—Houston [14th Dist.] 2009, no

pet.); *see also Barrera v. Barrera*, No. 13-11-00116-CV, 2012 WL 256131, at *2 (Tex. App.—Corpus Christi Jan. 26, 2012, no pet.).

In dividing the parties' community estate, the trial court shall order a division of the property that it deems just and right, having due regard for the rights of each party. TEX. FAM. CODE ANN. § 7.001 (West 2006). The party who complains of the trial court's division of property must demonstrate from evidence in the record that the division was so unjust that the trial court abused its discretion. *Loaiza*, 130 S.W.3d at 899 (citing *Zeptner v. Zeptner,* 111 S.W.3d 727, 734 (Tex. App.—Fort Worth 2003, no pet.) (op. on reh'g.)). The trial judge may order an unequal division of marital property when a reasonable basis exists for doing so. *Murff*, 615 S.W.2d at 698–99; *Zorilla*, 83 S.W.3d at 252. Factors the trial court may consider in ordering an unequal division of marital property include the nature of the property and fault in the breakup of the marriage. *See Zorilla*, 83 S.W.3d at 252 (citing *Murff*, 615 S.W. 2d at 699).

Under an abuse of discretion standard, legal and factual insufficiency are not independent grounds of error, but are relevant factors in assessing whether the trial court abused its discretion. *Loaiza*, 130 S.W.3d at 900; *Zorilla*, 83 S.W.3d at 252.[5] Findings of fact issued by the trial court in a bench trial have the same force and dignity as a jury's verdict upon special issues; but the findings are not conclusive when a complete statement of facts appears in the record. *Middleton v. Kawasaki Steel Corp.*, 687 S.W.2d 42, 44 (Tex.

---

[5] We recognize other appellate courts apply a two-step analysis when reviewing for an abuse of discretion in dividing a marital estate: (1) did the trial court have sufficient information upon which to exercise its discretion; and (2) did the trial court err in its application of discretion. *See e.g.*, *Bush v. Bush*, 336 S.W.3d 722, 729 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Iliff v. Iliff*, 339 S.W.3d 126, 134 (Tex. App.—Austin 2009), *aff'd*, 339 S.W.3d 74 (Tex. 2011). However, this Court declined to apply this two-step inquiry in reviewing the trial court's division of the marital estate in *Zorilla v. Wahid*, 83 S.W.3d 247, 252 n.1 (Tex. App.—Corpus Christi 2002, no pet.), *disapproved on other grounds, Iliff v. Iliff*, 339 S.W.3d 74 (Tex. 2011). We note that even if we were to apply the two-step analysis in this case, it would not change the outcome of this appeal in any respect.

App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.); *Iliff v. Iliff*, 339 S.W.3d 126, 134 (Tex. App.—Austin 2009), *aff'd*, 339 S.W.3d 74 (Tex. 2011) ("In an appeal after a bench trial in which the trial court entered findings of fact and conclusions of law, the trial court's findings have the same weight as a jury verdict . . . . When challenged, we review the trial court's findings for legal and factual sufficiency."); *see also Gordon v. Gordon*, No. 14-10-01031-CV, 2011 WL 5926723, at *2 (Tex. App.—Houston [14th Dist.] Nov. 29, 2011, no pet.) (mem. op.). Therefore, we apply the same standards when reviewing the legal and factual sufficiency of the evidence supporting the trial court's findings of fact as we do when reviewing the evidence supporting a jury's answer to a special issue. *See Middleton*, 687 S.W.2d at 42; *Gordon*, 2011 WL 5926723, at *2.

When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827. We determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The factfinder is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819.

When reviewing the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of and contrary to the challenged finding. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986). After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635

(Tex. 1986).  Under this standard, the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony.  *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

### III.  FRAUD ON THE COMMUNITY – PURCHASE OF EDDE DRILLING

By her first issue, Cyndie argues that the trial court abused its discretion by concluding Troy's purchase of a 20% ownership interest in Edde Drilling was a valid community debt when undisputed evidence allegedly showed the actual value of the interest was $1,470,000.  Cyndie argues that the evidence conclusively shows that Troy committed actual fraud, or in the alternative constructive fraud, on the community estate "by concocting a bogus indebtedness of $4,000,000 to his mother."  Cyndie further argues that the trial court's findings to the contrary are against the great weight and preponderance of the evidence.  We disagree.

### A.  Legal Standard for Fraud on the Community Estate

Within the division of a marital estate, Texas law recognizes that one spouse's commission of fraud on the community estate may justify an unequal division of marital property.  *Schlueter v. Schlueter*, 975 S.W.2d 584, 588 (Tex. 1998).  A claim of fraud on the community is allowed in order to compensate the wronged spouse for his or her lost interest in the community estate.  *Id.* (citing *Belz v. Belz*, 667 S.W.2d 240, 246–47 (Tex. App.—Dallas 1984, writ ref'd n.r.e.).  The burden of proof to demonstrate the fairness of a transfer of property outside of the community is upon the spouse responsible for the transfer; however, the complaining spouse has the initial burden to show that there was a transfer of community property in the first place.  *In re Marriage of Notash*, 118 S.W.3d 868, 873 (Tex.

9

App.—Texarkana 2003, no pet.); *see also Nagubadi v. Nagubadi*, No. 13-02-621-CV, 2005 WL 327962, at *3 (Tex. App.—Corpus Christi Feb. 10, 2005, no pet.) (mem. op.).

Fraud on the community can be committed through actual or constructive fraud. *See In re Marriage of Notash*, 118 S.W.3d at 873; *see also Nagubadi*, 2005 WL 327962, at *3. Actual fraud requires the non-managing spouse to show that the other spouse dishonestly and purposely intended to deprive the non-managing spouse of the use and enjoyment of the assets of the joint community property. *See In re Marriage of Notash*, 118 S.W.3d at 873; *see also Nagubadi*, 2005 WL 327962, at *3. A presumption of constructive fraud arises when one spouse disposes of the other spouse's one-half interest in community property without the other's knowledge or consent. *Knight*, 301 S.W.3d at 731 (citing *Zieba v. Martin*, 928 S.W.2d 782, 789 (Tex. App.—Houston [14th Dist.] 1996, no pet.)). In that circumstance, the burden of proof to show fairness in disposing of community assets is upon the disposing spouse. *Knight*, 301 S.W.3d at 731; s*ee also Nagubadi*, 2005 WL 327962, at *3 ("Constructive fraud does not require a showing of fraudulent intent and may be shown if a managing spouse unfairly deprives the other spouse of the benefit of the community property.").

## B. Evidence Supports Court's Findings that Troy Did Not Commit Fraud

Our review of the record shows that there is sufficient evidence to support the trial court's findings that Troy did not commit actual or constructive fraud on the community estate in connection with the purchase of the 20% ownership interest in Edde Drilling. Cyndie relies primarily on the following evidence in support of her argument that Troy created a bogus $4,000,000 community debt by colluding with Rosemary to purchase a 20% interest in Edde Drilling for $4,000,000:

10

- Prior to Rosemary's sale of the 20% interest to Troy in June 2006, at the time of settling her late husband Tommy's estate, a 20% interest in Edde Drilling was valued at $1,470,000 in a report to the Internal Revenue Service.

- Troy's CPA, Paul Teinert, prepared an amortization schedule for a loan of $1,470,000, not $4,000,000.[6]

- Cyndie's financial expert, William Stewart, did not see any documentation of the sort financial experts rely upon to support a $4,000,000 valuation of the 20% interest in Edde Drilling.

- Stewart and Troy's financial expert, Haran Levy, agreed that as of May 31, 2010, the community's 25% interest in Edde Drilling was worth $2,183,000.

- In her testimony about how Rosemary and Troy reached the $4,000,000 price for a 20% interest, Rosemary stated they "just kind of plucked it out of the air."

- In his 2005 conversation with financial planner Orr, Troy asked about how to hide money from Cyndie in the event of a divorce.

- One draft of the purchase agreement provided that Rosemary had the option to immediately receive a lump sum of $4,000,000 in the event Troy passed away or divorced.

The record shows that the trial evidence was conflicting, but sufficient to support the trial court's findings that Troy did not commit fraud. Troy testified that he and Rosemary drafted the Purchase Agreement themselves using information from the internet. Neither was trained in drafting legal documents, and they created multiple drafts of the proposed purchase agreement. Most were discarded, but a prior draft survived and was produced in discovery. Troy's undisputed testimony was that Exhibit P-18 was a superseded draft of the Purchase Agreement and that Exhibit P-63 was the operative Purchase Agreement for Rosemary's sale of a 20% interest in Edde Drilling. The two drafts were executed the same day, June 1, 2006, and are very similar. However, Exhibit P-18 included a provision that in

---

[6] Paul Teinert testified that his understanding was that the debt for the purchase of the 20% interest in Edde Drilling was $1,470,000, payable at a rate of $10,000 per month, with a balloon payment of $2,530,000, for a total of cost of $4,000,000.

the event of Troy's death or his becoming a party to a divorce action, Rosemary could, "at her sole option, receive a one-time payment of $4,000,000.00 as final consideration for the membership units transferred by" the agreement. In contrast, the operative Purchase Agreement, Exhibit P-63, provided that in the event of Troy's death or his becoming a party to a divorce action, Rosemary had the option to receive a one-time payment of the remaining principal due under the note.[7] Consistent with the operative Purchase Agreement, Troy's financial expert, Haran Levy, testified that he was not of the opinion that Troy owed Rosemary a lump-sum $4,000,000 payment at the time of the divorce.

The testimony showed that it was Rosemary's idea to include the death-or-divorce provision in the Purchase Agreement because she was concerned about protecting her livelihood. Rosemary testified that she was concerned about protecting her interest under the agreement because Troy might be killed in a car accident and because more than 50% of marriages end in divorce.

Rosemary also testified that $4,000,000 was a fair sale price for her 20% ownership interest in Edde Drilling. Rosemary testified that Tommy, before he passed away, asked her to sell the 20% ownership interest to Troy. She and Troy discussed the purchase price and felt $4,000,000 was a fair price. Although she did at one point testify they "just kind of plucked" the $4,000,000 price out of the air, she later stated that the price accounted for the transfer of an interest in Edde Drilling's physical assets as well as the good will[8] that she and

---

[7] Another difference between the two drafts was that under the superseded draft, Exhibit P-18, Rosemary would be paid $10,000 per month on the first day of each month, whereas under the operative Purchase Agreement Rosemary would be paid $60,000 twice each year.

[8] We note that no issue was raised in this appeal concerning the propriety of including goodwill in the sale price of the ownership interest in Edde Drilling. *See, e.g.*, *Rathmell v. Morrison*, 732 S.W.2d 6, 17–18 (Tex. App.—Houston [14th Dist.] 1987, no writ) (discussing circumstances under which a business's goodwill is

Troy had worked for years to build. She described Edde Drilling as a "niche" business that had "a lot of potential" [9] at the time she sold her interest.

Rosemary acknowledged that after her husband's death, a 20% interest in Edde Drilling was valued at $1,470,000 for estate-tax purposes. Rosemary indicated that she was happy with this value for tax purposes. Troy testified that the rationale behind this valuation was to save money on taxes.

The record shows that Troy paid $60,000 in semi-annual payments to Rosemary after entering the Purchase Agreement. The evidence further demonstrated that a 20% ownership interest in the dividends and distributions of Edde Drilling between 2006 and 2009 was worth over $3,000,000:

| C. Year | Dividends/Distributions | 20% Share |
|---|---|---|
| 2006 | $ 4,130,000 | $ 826,000 |
| 2007 | $ 4,100,000 | $ 820,000 |
| 2008 | $ 6,600,000 | $1,320,000 |
| 2009 | $ 2,000,000 | $ 400,000 |
| Total | $ 16,830,000 | $3,366,000. |

Therefore, over the same time frame in which the community estate was entitled to receive $3,366,000 from a 20% interest in Edde Drilling, it made $480,000.00 in eight semi-annual payments to Rosemary.

_____

divisible in a divorce action).

[9] UHY Advisors valuation of Edde Drilling, as of May 31, 2010, states that Edde Drilling's income statements for 2005 through 2009 show a significant increase in revenue between 2005 and 2008. Specifically, between 2005 and 2008, Edde Drilling's revenue more than doubled before decreasing in 2009. According to the valuation, in addition to Rosemary's 2006 sale of a 20% ownership interest to Troy, in October 2007, Troy sold a 35% ownership interest in Edde Drilling to Raymond Bubak for $4.9 million. The same valuation states that "[c]onsidering the significant economic changes which have occurred since the fourth quarter of 2008, we did not believe these [sale] transactions to be valid as of the Valuation Date [i.e., May 31, 2010] given their date of sale." Additionally, these transactions were amongst related parties, which the report notes affected the applicability of valuation methods to the sale transactions.

13

At trial, Cyndie admitted that Rosemary was under no obligation to sell her 20% ownership interest in Edde Drilling to Cyndie and Troy. Cyndie testified that she asked Troy to request a valuation of the 20% interest in Edde Drilling before purchasing it from his mother, but Troy did not do so. Cyndie admitted that at the time of the transaction, she knew that she and Troy would be paying Rosemary $10,000 per month for the 20% interest in Edde Drilling and that Troy and Rosemary were executing paperwork concerning the transaction. Cyndie testified that she did not know the contents of the paperwork but "assumed" it was consistent with what Troy had told her about the transaction. Cyndie admitted that she received greater income as a result of the purchase from Rosemary because it entitled Troy and Cyndie to a greater share of the profits of Edde Drilling.[10]

We conclude that the trial court did not abuse its discretion by finding Troy did not commit actual or constructive fraud on the community estate in connection with the community's purchase of a 20% interest in Edde Drilling. The record shows that the purchase was financially beneficial to the community estate. There was sufficient evidence in the record from which the trial court could reasonably conclude Troy lacked fraudulent intent (actual fraud) and did not unfairly deprive Cyndie of the benefit of community property (constructive fraud) in purchasing the 20% ownership interest in Edde Drilling from Rosemary. *See In re Marriage of Notash*, 118 S.W.3d at 873; *see also Nagubadi*, 2005 WL 327962, at *4. Cyndie's first issue is overruled.

---

[10] Cyndie testified that her and Troy's adjusted gross income exceeded $5,000,000 in 2007 and exceeded $6,000,000 in 2008.

14

## IV. FIFTY PERCENT OWNERSHIP INTEREST IN TUCKER OPERATING COMPANY

By her second issue, Cyndie argues Troy failed to prove by clear and convincing evidence that the 50% ownership interest in Tucker Operating Company was his separate property. Cyndie argues that as a result, the trial court abused its discretion when it characterized the 50% ownership interest as Troy's separate property and thus, did not include the property in the division of marital property. We disagree.

### A. Standard of Review for a Claim of Separate Property

The Texas Family Code defines separate property as that property owned or claimed by a spouse before marriage, acquired during the marriage by gift, devise, or descent, or as a recovery for personal injuries sustained during the marriage. TEX. FAM. CODE ANN. § 3.001 (West 2006); *see also Graves v. Tomlinson*, 329 S.W.3d 128, 138 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (citing *Barnett v. Barnett*, 67 S.W.3d 107, 111 (Tex. 2001)). Community property consists of the property, other than separate property, acquired by either spouse during marriage. TEX. FAM. CODE ANN. § 3.002; *Graves*, 329 S.W.3d at 138. All property possessed by either spouse during or upon dissolution of the marriage is presumed to be community property. TEX. FAM. CODE ANN. § 3.003(a); *Graves*, 329 S.W.3d at 138–39.

To overcome the community-property presumption, a spouse claiming assets as separate property must establish their separate character by clear and convincing evidence. TEX. FAM. CODE ANN. § 3.003(b); *Graves*, 329 S.W.3d at 139; *see also Michelena v. Michelena*, No. 13-09-00588-CV, 2012 WL 3012642, at *10 (Tex. App.—Corpus Christi June 15, 2012, no pet.) (mem. op.). "Clear and convincing" evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as

15

to the truth of the allegations sought to be established. *Graves*, 329 S.W.3d at 139 (citing *In re J.F.C.,* 96 S.W.3d 256, 264 (Tex. 2002)); *see also* TEX. FAM. CODE ANN. § 3.003(b).

The spouse claiming that certain property is "separate" must trace and clearly identify the property claimed to be separate. *Graves*, 329 S.W.3d at 139; *see also Michelena*, 2012 WL 3012642, at *10. Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property. *Graves*, 329 S.W.3d at 139; *see also Michelena*, 2012 WL 3012642, at *10. As a general rule, the clear and convincing standard is not satisfied by testimony that property possessed at the time the marriage is dissolved is separate property when that testimony is contradicted or unsupported by documentary evidence tracing the asserted separate nature of the property. *Graves*, 329 S.W.3d at 139. Any doubt as to the character of property should be resolved in favor of the community estate. *Graves*, 329 S.W.3d at 139 (citing *Boyd v. Boyd,* 131 S.W.3d 605, 612 (Tex. App.—Fort Worth 2004, no pet.)).

Because the standard of proof for a separate-property finding at trial is the heightened "clear and convincing" evidence standard, the standard of appellate review is likewise heightened. *See City of Keller*, 168 S.W.3d at 817. In a legal sufficiency review of a separate-property finding, we examine all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Graves*, 329 S.W.3d at 139 (citing *Stavinoha v. Stavinoha*, 126 S.W.3d 604, 608 (Tex. App.—Houston [14th Dist.] 2004, no pet.)). Looking at the evidence in the light most favorable to the finding means we must (1) assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so;

16

and (2) disregard all contrary evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* (citing *In re J.F.C.*, 96 S.W.3d at 266); *see also City of Keller*, 168 S.W.3d at 820 ("Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted …. But whenever reasonable jurors could decide what testimony to discard, a reviewing court must assume they did so in favor of their verdict, and disregard it in the course of legal sufficiency review."). However, we can consider undisputed facts that do not support the finding. *Graves*, 329 S.W.3d at 139. If we determine that no reasonable factfinder could form a firm belief or conviction of the truth of the matter to be proved, we must conclude that the evidence is legally insufficient. *Id.* If we determine that the evidence is factually insufficient, we must detail in our opinion why we have concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding. *Id.*

## B.    Sufficient Evidence Supports Trial Court's Separate-Property Finding

The record shows that Tucker Operating Company is an oil and gas company that was formed in 1980 to operate oil wells. Cyndie argues that the evidence shows Troy acquired his interest in Tucker Operating Company during their marriage, so that it was community property subject to division in the divorce. Cyndie relies primarily on the following evidence to argue Troy did not meet his burden to show the 50% ownership interest in Tucker Operating Company was his separate property acquired before their marriage:

- While the corporate minutes showed Tucker Operating Company's 1980 purchase of Jon Nelson's interest in Tucker Operating Company for $150,000, the minutes did not show a sale of corporate stock to Troy in January 1992.

17

- Tucker Operating Company's 2005 tax return showed Troy's father owned 100% of the stock in Tucker Operating Company. Tucker Operating Company's tax returns for 2007 through 2009 show Troy owned 100% of Tucker Operating Company, not 50% of Tucker Operating Company.

- As conceded by Troy's own financial expert, Levy, the original stockholder's ledger for Tucker Operating Company did not show a sale of company stock to Troy in 1992 or any other year.

- After this divorce action commenced, Rosemary corrected the corporate ledger to show Troy's purchase of a 50% interest in Tucker Operating Company in 1992, prior to his marriage to Cyndie.

Cyndie testified that she first heard Troy claimed an ownership interest in Tucker Operating Company after his dad Tommy died in 2005. Cyndie testified that after they married, when she became pregnant, Troy worked at Tucker Operating Company and asked Tommy for a raise. According to Cyndie, Troy did not seem like an owner of Tucker Operating Company at this early juncture in their marriage.

Troy testified that in 1991 or 1992, before he married Cyndie, Tommy agreed to sell a 50% ownership interest in Tucker Operating Company to him for $500,000. Troy testified that this transaction was documented in a promissory note executed between him and Tommy on January 1, 1992.[11] The promissory note was admitted into evidence at trial.[12] According to the terms of the note, Troy would pay $500,000 for 50% of the common stock in Tucker Operating Company. Troy testified that Tommy excused him from paying on the

---

[11] The minutes of the February 2, 1992 Annual Meeting of the Stockholders, Officers and Directors of Tucker Operating were admitted into evidence and show that at the meeting, Troy was elected to the position of Vice President, Tommy was elected President, and Rosemary was elected Secretary-Treasurer.

[12] On cross-examination, Troy testified that he did not know why the 1992 promissory note and a draft of the 2006 Purchase Agreement for the community's 20% interest in Edde Drilling were written in the same font. Rosemary testified she probably found the copy of the promissory note in her fireproof file and retrieved it for production in discovery. The record does not contain any evidence that directly undermines Troy's authentication of the promissory note.

18

note and that his 50% interest in Tucker Operating Company could be considered a gift. He also testified that he believed it was a clerical error for the Tucker Operating Company tax returns for 2007 through 2009 to show he owned 100% of Tucker Operating Company.

Rosemary testified that shortly after Tommy transferred a 50% ownership interest in Tucker Operating Company to Troy, he casually mentioned this transaction to her, but that she forgot to record it at the time. She testified that after this divorce suit commenced, she updated the stockholders' ledger to show that Tommy gave Troy a 50% ownership interest in Tucker Operating Company. In an affidavit admitted into evidence, Rosemary explained that she updated the stockholders' ledger when she became aware the transfer from Tommy to Troy had not been documented in the ledger. She swore that no one asked or told her to make the updated entry.

Rosemary also testified that she owns the other 50% ownership interest in Tucker Operating Company, and that shortly before Tommy's death, that 50% ownership interest was transferred to the T.W. & R.M. Tucker Living Trust. The "Assignment of Shareholder Interest" showing Rosemary and Tommy's transfer of their ownership interest in Tucker Operating Company to the Living Trust was admitted into evidence. It is notarized, dated September 2, 2005, and signed by Tommy and Rosemary Tucker. While the document provides that all of their ownership interest is transferred to the Living Trust, it does not state the number of shares or percentage of interest they owned in Tucker Operating Company at the time of the transfer. The validity of the transfer to the Living Trust is not challenged on appeal. Significantly, the transfer of their ownership interest in Tucker Operating Company to the Living Trust is likewise not documented in the corporate minutes, the corporate tax returns, or the stockholders' ledger, and is contrary to Cyndie's argument that the 1992

19

transfer to Troy of a 50% ownership interest in Tucker Operating Company would have necessarily been documented in these records.

Troy's financial expert, Levy, testified that omissions in record keeping are more common in small businesses than in large, publicly-traded companies. Levy testified that he investigated the characterization of the ownership of Tucker Operating Company, and stated that the people with whom he spoke confirmed Troy's separate 50% ownership interest.[13] Levy explained that the tax returns showing Troy owned 100% of Tucker Operating Company for three years had no tax significance and no impact on any valuation of the business.

We conclude the evidence was sufficient to produce in the factfinder's mind a firm belief or conviction that Troy acquired a 50% ownership interest in Tucker Operating Company before his marriage to Cyndie. *See, e.g.*, *Bush v. Bush*, 336 S.W.3d 722, 744 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (concluding evidence was sufficient to support trial court's finding that four horses were husband's separate property, despite wife's claim to the contrary). In addition to the testimony that Troy owned a 50% ownership interest in Tucker Operating Company prior to the marriage, Troy's ownership interest was documented in the updated stockholders' ledger and evidenced by the 1992 promissory note. *See e.g., Zagorski v. Zagorski*, 116 S.W.3d 309, 315 (Tex. App.—Houston [14thDist.] pet. denied) (op. on reh'g) (concluding testimony and corroborating documentary evidence were sufficient to show by clear and convincing evidence that account was husband's

---

[13] In an August 2010 letter to Levy, Cyndie's financial expert acknowledged the evidence showed Troy separately owned a 50% interest in Tucker Operating if the company's tax returns were incorrect and if Rosemary still owned the remaining 50% of the company.

separate property). On this record, we cannot conclude the trial court abused its discretion by finding this interest was Troy's separate property. Cyndie's second issue is overruled.

## V. ATTORNEY'S FEES

By her third issue, Cyndie argues that the trial court abused its discretion by failing to take into account Troy's payment of $547,634.69 from the community estate to cover a portion of his attorney and expert fees. Cyndie argues that only $224,018.77 was paid out of the community estate for her attorney fees and expenses, making it unfair for the trial court to order that each party pay its own outstanding balance for legal and expert fees. The record shows that Troy's outstanding legal and expert fees were $99,902.22 and Cyndie's were $364,255.48.

A trial court has broad discretion in how it considers a party's payment of attorney fees from the community estate pending divorce. *See Grossnickle v. Grossnickle*, 935 S.W.2d 830, 847 (Tex. App.—Texarkana 1996, writ denied). Prior payments out of the community estate to attorneys in the divorce action are to be taken into account in the division of the marital estate. *Id.* at 848 (citing *Eikenhorst v. Eikenhorst*, 746 S.W.2d 882, 890 (Tex. App.—Houston [1st Dist.] 1988, no writ)).

The trial court's finding and conclusion that Cyndie was at fault in the divorce because she committed adultery are not disputed on appeal. In addition, it is undisputed that the trial court awarded 60% of the community estate to Troy and 40% of the community estate to Cyndie. The record does not show the trial court failed to consider Troy's prior payment of attorney's fees in dividing the community estate. Evidence of the attorney fees was introduced at the bench trial, and the trial court made fact findings concerning each party's outstanding balance of unpaid attorney and expert fees.

21

On this record, we cannot conclude the trial court abused its discretion in its consideration of Troy's payment of a portion of his attorney and expert fees from the community estate. *See id.*; *see also Oliver v. Oliver*, 741 S.W.2d 225, 228–29 (Tex. App.—Fort Worth 1987, no writ) (upholding 80/20 property division in wife's favor when husband committed adultery). Cyndie's third issue is overruled.

## VI. CONCLUSION

We affirm the trial court's Final Decree of Divorce.

Gregory T. Perkes
Justice

Delivered and filed the
24th day of January, 2013.